[No. A091444. First Dist., Div. Two. Apr. 7, 2004.]

LEONARD WHITELEY, Plaintiff and Respondent, v.
PHILIP MORRIS, INC. et al., Defendants and Appellants.

COUNSEL

Heller Ehrman White & McAuliffe, M. Laurence Popofsky, Curtis M. Caton, David B. Goodwin, Nina A. M. Greeley, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, H. Joseph Escher III, Richard Shively; Shook, Hardy & Bacon, Gerald V. Barron, Mordecai D. Boone; Womble, Carlyle,

Sandridge & Rice, Jeffrey L. Furr, Christopher A. Kreiner and William E. Latham II for Defendants and Appellants.

Wartnick, Chaber, Harowitz & Tigerman, Harry F. Wartnick, Madelyn J. Chaber, Robert M. Brown; Law Offices of Daniel U. Smith, Daniel U. Smith and Ted W. Pelletier for Plaintiff and Respondent.

**OPINION**

**KLINE, P. J.—**

### Introduction

Defendants Philip Morris Inc. (Philip Morris) and R.J. Reynolds Tobacco Company (R.J. Reynolds) appeal from a judgment of $21,689,117 (including $20 million in punitive damages) following a jury verdict in favor of Leslie Whiteley (Whiteley), a smoker who was diagnosed with lung cancer in 1998 and died in July 2000, and her husband, plaintiff Leonard Whiteley.

Defendant tobacco companies urge us to reverse the judgment, claiming error on several grounds: (1) Under Civil Code, former section 1714.45,[1] as recently interpreted by the California Supreme Court in *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828 [123 Cal.Rptr.2d 40, 50 P.3d 751] (*Myers*) and *Naegele v. R.J. Reynolds Tobacco Co.* (2002) 28 Cal.4th 856 [123 Cal.Rptr.2d 61, 50 P.3d 769] (*Naegele*), defendants cannot be liable for fraud, negligent design, or other such product liability claims based on conduct occurring from January 1, 1988 to January 1, 1998. Defendants contend that the trial court prejudicially erred in refusing to instruct the jury, as requested by defendants, that it could not base liability on conduct occurring during this 10-year period.[2] Defendants also contend that the fraud verdicts are factually and legally flawed, arguing: (2) that much of plaintiff's fraud claim is preempted by the Federal Cigarette Labeling and Advertising

---

[1] Statutory references are to the Civil Code, unless otherwise indicated.

[2] The briefing here was completed before the Supreme Court opinions issued in *Myers, supra,* 28 Cal.4th 828 and *Naegele, supra,* 28 Cal.4th 856. Defendants initially argued that the version of former section 1714.45, in effect until January 1998, immunized them from liability on *all* claims at issue here. They argued that the Legislature's 1998 amendment to the statute to remove the automatic immunity granted by the pre-1998 version of section 1714.45 did not apply retroactively to pre-1998 conduct. They also argued that, at a minimum, the court prejudicially erred in refusing their proposed instruction telling the jury it could not base liability or punitive damages on conduct during that 10-year period. At our request, the parties filed supplemental letter briefs on the impact of *Myers* and *Naegele* on this appeal. Defendants continue to claim that the trial court prejudicially erred in refusing to instruct the jury that defendants' conduct was immune during the 1988–1998 period the statute was in effect.

Act of 1969 (15 USC §§ 1331–1340), and (3) that the record does not support the jury's finding of reasonable reliance. (4) Defendants also contend the negligence verdict fails because plaintiff failed to present substantial evidence of any safe alternative design or that defendants' alleged failure to produce a safer cigarette caused Whiteley's injury. They further argue the court erred in refusing to instruct the jury in terms of BAJI No. 9.00.6. (5) Finally, defendants attack the punitive damages award.

We shall conclude: (1) The trial court erred in refusing to instruct the jury regarding the 10-year statutory immunity and that the error was prejudicial. (2) The fraud claim was not preempted. (3) Substantial evidence supports the jury's finding reasonable reliance. (4) The negligent design verdict is not supported by substantial evidence that the negligent design of cigarettes was a substantial factor contributing to Whiteley's risk of developing lung cancer. (5) It is unnecessary to address the punitive damages issue at this time. We shall reverse the judgment and remand to the trial court for a new trial on the fraud-related causes of action and for entry of judgment in favor of defendants on the negligent design cause of action.

### Facts and Procedural Background

#### A. *Facts*

■ Viewed in the light most favorable to the judgment,[3] the evidence shows that Leslie Whiteley, who was born in 1959, smoked her first cigarette with a friend in 1972 at age 13.[4] She was influenced to start smoking by peer pressure, a desire to fit in and to look cool, as well as by candy and gum cigarettes and advertisements on TV. It was a "rite of passage" and she "had seen adults smoking" and "was curio[us] to try to see what it was like." "[P]eer pressure" was also a factor. "Not just one reason" influenced her to start smoking cigarettes. She recalled cigarette advertisements on TV during her childhood, particularly the Winston song on the Flintstones cartoon series and the "rugged Marlboro Man," and billboards where "everybody looked

---

[3] "A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 349, p. 394.) Consequently, in summarizing the facts on appeal we "must consider the evidence in the light *most favorable to the prevailing party*, giving him the benefit of *every reasonable inference*, and *resolving conflicts* in support of the judgment." (*Id.*, § 359, p. 408.)

[4] Portions of Whiteley's videotaped deposition were viewed and read into the record at trial and are part of the record on this appeal. Whiteley testified briefly at trial. However, when she became unable to testify further, the trial court struck her live testimony.

healthy, white teeth, suntans, having fun." She recalled seeing advertisements for cigarette brands while watching TV during her junior high school years.

As a teenager growing up, Whiteley did not believe that cigarettes could cause serious disease, death or cancer. Her parents never told her that smoking could cause cancer, death or any health risk. Her parents testified they did not know or believe that smoking caused cancer. The only teacher who ever suggested Whiteley should quit smoking was her junior high gym teacher who warned her that smoking would slow her down in running track and field. When the high school dean caught Whiteley smoking in the bathroom, she was suspended for breaking the rules, but the dean did not tell her she should not smoke because of health consequences. The dean testified she was not "aware" at that time that smoking caused cancer.

Whiteley did not recall actually seeing a cigarette package warning until she became pregnant in 1988. At that time, she thought that if smoking actually caused lower than normal birth weight, then, "Thank God I smoked." As a teenager, had she read the warning that "smoking is dangerous," she would not have interpreted that to mean that smoking could cause serious disease. As a 13-year-old, she would not have known what "dangerous" meant in that context: "Will it blow up? Will it burn me?" She wouldn't "know it meant death or illness or disease." As an adult, she heard that the tobacco companies were saying the government made them put the warning labels on cigarettes. She believed the tobacco companies' denials that smoking cigarettes caused cancer and "thought that the government was just sticking their nose into business it didn't belong in." She believed the tobacco companies had said that it was safe to smoke. Although she could not say when she heard this information, she believed the source of this information "must have been a media or—or TV, or I read it somewhere." She believed the tobacco companies, because they manufactured the cigarettes. "[T]hey made them so they knew what they did to people or didn't do to people, so I believed them." The worst she thought cigarettes could do in adults was to cause a "bad cough," because she had seen her grandmother coughing in the morning. She learned that cigarettes could cause something more serious than low birth weight or a cough in an older person "[t]he day the doctor told me I had lung cancer."

When Whiteley began smoking, she smoked from "five" cigarettes to "half a pack" per day. She liked Marlboro cigarettes (a Philip Morris product) because it seemed that "[a]ll teenagers smoked Marlboros." In high school, Whiteley smoked "[a]bout half a pack a day." She switched between Marlboro cigarettes and Camels (an R.J. Reynolds product). In high school, she never thought that she would be a smoker for all of her life. At age 15, she tried to quit for the first time because she did not have money to buy cigarettes, but it did not last.

As an adult, Whiteley began smoking her first cigarette each day as soon as she woke up. She smoked all day long and had to leave nonsmoking places like a church or movie theatre to have a cigarette. She smoked when she was sick with a cold or the flu and even smoked during her pregnancies, including on the way to the hospital. She made at least one serious effort to quit in 1989, when she and Leonard tried to quit together during a camping trip to Yosemite. They tried because they were having children. It was "sheer hell." Whiteley went through "really bad withdrawals," experienced "extreme dizziness," could not "think" or "concentrate," was "very irritated and agitated," and "craved cigarettes very badly." She and Leonard "fought and bickered" until they went back to smoking. According to plaintiff's expert Neal Benowitz, who analyzed Whiteley's smoking history and behavior under the "Fagerstrom Dependence Questionnaire," Whiteley was "highly addicted."[5] Also opining that she had a "smoking addiction" was her pregnancy doctor, Jeffrey Randa Richardson. Her treating physician Thomas Brugman thought she "probably" was addicted.

Whiteley continued to smoke until February 1998, when she suffered an acute bronchitis episode, which her doctor told her would persist chronically if she did not stop smoking. She nevertheless tried to smoke on the way home from the doctor, but could not breathe. Whiteley first learned that smoking could cause something more serious than a cough or not running as fast, "[t]he day the doctor told me I had lung cancer," in June 1998. Whiteley died on July 3, 2000, at the age of 40.

The jury could find that by the mid-1950's medical authorities agreed and the tobacco industry (including these defendants) knew and admitted privately that smoking causes lung cancer. By about 1957, "all serious scientists" had "accepted" that "smoking was a cause of lung cancer," a fact that thereafter was not "seriously questioned."

In the early 1950's, the studies from medical research began to leak into the popular press. Defendants and other cigarette manufacturers agreed to act together to counter mounting scientific evidence of the health risks of cigarette smoking. Defendants launched a massive public relations campaign—to discredit and distort the truth about smoking and cancer, to deny any link between smoking and serious illness, and to persuade the public that "there is no proof that cigarette smoking is a cause of lung cancer"—the underlying purpose of which was "reassurance of the public." Defendants and the tobacco industry undertook public opinion polling to assist in crafting a

---

[5] We are using the term "addicted" as shorthand. We do not here declare as a judicial fact that tobacco is addictive in any settled medical sense. That question is not before us. The jury could find that tobacco was addictive in the sense supported by the evidence and supportive of the judgment.

public information message to "offset anti-cigarette propaganda and to give justified reassurance to the public."

A major part of this strategy was the creation in 1954 of an independent "research institute." The public was told that the institute would attempt to find the truth about smoking and health. The Tobacco Industry Research Committee (later renamed the Council for Tobacco Research, hereafter the TIRC or committee), financed the work of the Scientific Advisory Board, the "primary objective" of which was stated to be "to further the search for the cause or causes of cancer, particularly lung cancer, and of cardiovascular disease, and for the control of those diseases." In truth, the TIRC was "an industry 'shield' " whose real purpose was public relations, not research. The governing committee was made up of tobacco executives. The TIRC allocated only a small amount of money to actual research. Instead, it "carried" the "public relations load" to "stamp out" any "brush fires" (that is, publication of the truth) "as they arose." Industry executives and attorneys dominated the TIRC meetings and controlled its actions. Nor was the Scientific Advisory Board independent, as claimed by the TIRC. Defendants and other tobacco companies packed the board with industry-friendly scientists, requiring that members have no "opinion" that the studies linking smoking and lung cancer were valid. Consequently, some board doctors publicly claimed no "relation between smoking and lung cancer" and that it was " 'silly' to relate emphysema to cigarette smoking." Nevertheless, defendants publicly claimed the board had "complete scientific freedom." In truth, the TIRC was a public relations "front," which tried to prove that smoking did not cause disease. Defendants used the research vehicle to establish expert scientific witnesses, to testify on behalf of the industry, as a source of information for legal guidance, and as an industry research tool for attacking the smoking and health question. The TIRC attacked legitimate research with studies asserting the statistical research connecting lung cancer and smoking had been done "incorrectly."

As part of this campaign, in January 1954, tobacco company chief executive officers signed a "Frank Statement to Cigarette Smokers," falsely proclaiming that smoking was "not injurious to health" and that there was "no proof" that smoking was one of the causes of lung cancer. The "Frank Statement" was not truthful. Defendants also made false research promises, claiming their "paramount" concern was "people's health" and that they would cooperate closely with public health officials to aid the research effort into all phases of tobacco and health. They also promised to study the issue and get back to the American people as to whether it was true that cigarette smoking caused lung cancer.

Despite their repeated promises throughout the next 50 years, that they would conduct research and would publicize the "facts" and the "truth,"

defendants never intended to research all aspects of smoking to find the truth. They were reticent to do medical research or biological research and testing, doing just enough research to seem legitimate. For decades, defendants avoided research in order to deny knowledge that smoking causes cancer, in hopes of avoiding legal liability. This avoidance of research allowed them to publicly proclaim in 1967 that "[n]o *biological* mechanism has been demonstrated that would explain how smoking leads to any disease which has been reported as statistically associated with it." In 1969, Philip Morris admitted that its research and development department had not been "differentiated from the *public relations* activities." (Italics added.) Defendants used their research departments for "defensive" public relations to counter the Surgeon General's report on smoking and health, and other true reports by "provid-[ing] some answers which will give smokers a psychological crutch and a self-rationale to continue smoking."

Defendants also concealed their knowledge about smoking and cancer to avoid liability. They destroyed incriminating documents, including reports containing adverse data. Defense counsel admitted at trial that this intentional document destruction was "bad," "troublesome," and "wrong-headed." Defendants also hid sensitive research on cancer and addiction at industry-friendly labs or in other countries outside subpoena range of the United States. Contrary to defendants' public claims that they would fully disclose all information, not simply that which supported the tobacco industry's point of view, defendants did not publish adverse results. When they did publish information, they "of course" omitted adverse results. Defendants terminated research that threatened the industry, confiscating or destroying records of adverse data.

In 1958, defendants created the Tobacco Institute, a public relations group that issued false press releases and published "Tobacco and Health," a bogus report that looked like a newspaper with defendants' false denials under headlines like "Smoking Link Disputed." With each issue, the Tobacco Institute used a "news release" to attract press attention so that the "major wire services usually carrie[d] stories." Doctors, dentists, medical schools and pharmacists were all targeted to receive these publications. In 1970, the Tobacco Institute sent a letter with false health claims to doctors. Other strategies included manipulating the mass media to suppress or make light of adverse studies or reports.

The defendants' disinformation campaign was a deliberate "holding strategy" or "delaying action" to keep the public smoking without fear. In 1972, the year in which 13-year-old Whiteley smoked her first cigarette, the Tobacco Institute admitted that for "nearly twenty years this industry has employed a single strategy to defend itself on major fronts—politics and

public opinion." That strategy "has always been a holding strategy, consisting of [¶]—creating doubt about the health charge without actually denying it [¶]—advocating the public's right to smoke without actually urging them to take up the practice [¶]—encouraging objective scientific research as the only way to resolve the question of health hazard." The industry plan was never to "win the health war," but to wage a "delaying action."

The jury could also find that defendants engaged in saturation advertising targeting adolescents, the age group from which new smokers must come. Philip Morris long "rel[ied] on a rapidly increasing pool of teenagers from which to replace smokers lost through normal attrition." R.J. Reynolds recognized that "teenagers" were "a supply of new smokers to replace the old." Defendants knew that persons who did not begin smoking before age 18 were unlikely to do so. Defendants researched how to win young smokers and, in marketing their cigarettes, they exploited their findings about the psychosocial motivations leading teenagers to smoke, including: the desire to "be grown-up" and "signif[y] adulthood," to "enhance [one's] image" and "look older," for "peer group acceptance," to act "tough" and "adventurous," to "show [one's] independence" and "revolt against authority" by declaring, "I am no longer my mother's child." They used images of smokers calculated to induce minors to smoke. Both defendants aimed advertising and promotions directly at young people. The jury could find these targeted teenage consumers possessed less critical judgment and were generally more receptive to marketing manipulation than adults. Moreover, the jury could also find that teenagers who went past the experimentation phase quickly became addicted to tobacco and found it extremely difficult to stop smoking, having suffered impaired judgment about the consequences of continuing to smoke.

Nor did defendants engage in a real attempt to produce safer cigarettes, despite their claims to the contrary. In part, this was due to their own efforts to stay ignorant of the "biological" effects of smoking in order to avoid liability. Plaintiff produced evidence that defendants intentionally failed to employ feasible measures to remove carcinogens from cigarette smoke. They failed to do essential "whole product" testing of cigarettes, which would have tested the synergy of components. They never tested to determine whether reducing tar in cigarettes actually reduced the exposure to carcinogens. Defendants shut down projects showing that safer cigarettes were feasible. They resisted developing "acceptable low-nicotine products" because it would "make it easier for dedicated smokers to quit."

Plaintiff introduced evidence that nicotine is an "extremely addictive" drug that "keeps smokers smoking." The "nicotine effect" "reinforce[es] the smoking act" and "makes smokers continue to smoke." Many smokers have "great difficulty quitting." Nicotine addiction is the norm: "most daily

smokers are addicted to nicotine." Defendants knew that nicotine was addictive, but concealed this knowledge from the public and falsely claimed up until the late 1990's that smoking was not addictive, but merely "habituating." Even at trial, defendants denied that they sold nicotine, but argued they sold "taste" even though they had previously admitted that a cigarette's "taste" is really just the nicotine effect. Defendants concealed their knowledge about nicotine's severely addictive nature and hid or shelved nicotine research.

Knowing that without addiction they would be "out of business," defendants manipulated nicotine levels to keep the nicotine delivery level "as high as possible." Defendants systematically manipulated nicotine levels in their products so that every cigarette in a package has about the same level of nicotine. They did so by controlling nicotine content and its impact. One main method of controlling nicotine's impact on the smoker is to change the pH balance of smoke through adding ammonia, which extracts the nicotine from tobacco and increases the amount of nicotine that is set free and therefore enters the bloodstream more rapidly. Philip Morris has "ammoniated" tobacco in its Marlboro cigarettes since 1965, and R.J. Reynolds has ammoniated tobacco in its Camel cigarettes since about 1975. Although the nicotine levels overall were reduced from 1950's levels, the pH manipulation nullified that reduction, delivering essentially the same amount of "free" nicotine and keeping cigarettes fully addictive. All the while, defendants falsely denied they controlled nicotine at all, again telling the public to "rest assured." R.J. Reynolds stated that the accusations of spiking nicotine levels was "sheer nonsense," while Philip Morris asserted that it did not "manipulate" or "control" the level of nicotine in their cigarettes.

In response to the "cancer scare," defendants suggested to the public that "low tar" cigarettes were "healthier," inviting smokers to "[i]nhale to your heart's content!" They "more or less" claimed that these filter cigarettes had a "high-tech filter that would filter out any of the bad substances." But defendants knew that filter cigarettes had similar "carcinogenicity" to unfiltered cigarettes and were "no less tumorigenic." Moreover, they knew that a smoker who switches to a high filtration cigarette that delivers less nicotine often winds up smoking more to compensate.

In 1966, Congress required that cigarette packages bear a relatively mild warning that smoking "may be hazardous to your health." In 1969, Congress required a more strongly worded warning and required that it appear in advertising as well as on packages. At that time, Congress explicitly preempted any state law imposing a "requirement or prohibition with respect to advertising or promotion" of cigarettes—language that has been construed by the Supreme Court to preempt many, but not all, common law tort claims.

(See pt. II, *post.*) Since 1972, the "Surgeon General's warning" has been "displayed in all cigarette advertising." From 1985, Congress has required cigarette packages to be labeled with one of four "rotating warnings," each explicitly labeled a "Surgeon General's warning . . . ." These warnings advised: "Smoking causes lung cancer, heart disease and emphysema"; "Quitting smoking now greatly reduces serious risks to your health"; "Smoking by pregnant women may result in fetal injury, premature birth and low birth weight"; and "Cigarette smoke contains carbon monoxide."

Defendants continued to assure the public that they disagreed with these warnings, by denying it had been proved that smoking was "hazardous" or "dangerous" or caused disease, and by publicly disavowing the warnings. In 1969, Joseph F. Cullman, Chairman of the Board of Philip Morris, claimed publicly that defendants were "forced to label their products as possible hazards to health" and that the industry did not accept that cigarettes were "hazardous." The Tobacco Institute, around 1980, claimed the "warning label" merely showed "how certain government officials feel about cigarette smoking."

Defendants knew they could keep people like Whiteley smoking by creating a false "controversy" about the health effects of smoking. As public health specialist Benowitz explained, the industry made statements that there was a controversy about the risks of smoking and whether or not nicotine was addictive, when in fact there was no medical or scientific controversy. Benowitz opined that the tobacco industry's statements disputing causation and addiction "have undermined the public health message to the result that people are in more doubt about whether the public health message is correct, and are less likely to take it seriously."

In 1988, the tobacco industry acquired a safe harbor under California law when tobacco was listed among "common consumer products" in former section 1714.45, a statute construed the following year to create an almost complete "immunity" from tort liability. (See *Myers, supra,* 28 Cal.4th at pp. 833–836.) The Legislature repealed that protection effective January 1, 1998. (See pt. I, *post.*)

B. *Procedural background*

On April 30, 1999, Leslie and Leonard Whiteley filed suit in San Francisco County Superior Court against defendants Philip Morris Inc. and R.J. Reynolds Tobacco Company, as well as against numerous asbestos companies. By the time of trial, all asbestos company defendants except Metalclad Insulation had been dismissed. Metalclad Insulation prevailed at trial.

Plaintiff's case went to the jury against the tobacco defendants on the following claims: (1) fraud by intentional misrepresentation; (2) fraud by

concealment prior to July 1, 1969; (3) fraud by false promise; (4) fraud by negligent misrepresentation; (5) conspiracy to misrepresent facts both before and after July 1, 1969; (6) conspiracy to conceal facts prior to July 1, 1969; (7) negligent failure to warn before July 1, 1969; and (8) negligent design.[6]

The jury began deliberations on the afternoon of Thursday, March 9, 2000. It reached a verdict on Monday, March 20, 2000, after seven days of deliberation. It returned special verdicts in favor of Whiteley on the causes of action for fraud by intentional misrepresentation, fraud by false promise, fraud by negligent misrepresentation, and negligent design. The jury found in favor of defendants on the remaining causes of action. With respect to the cause of action for fraud by concealment prior to July 1, 1969, it found that although defendants concealed or suppressed a material fact, defendants did not conceal or suppress the fact with the intent to defraud Whiteley. As to the two conspiracy causes of action, it found that Whiteley had not relied upon the concealment or misrepresentation, as she would have acted as she did had she known the concealed or misrepresented fact. As to the negligent failure to warn prior to July 1, 1969, it found that such failure was not a cause of injury and damage to Whiteley. The jury also found as to the fraud by intentional misrepresentation, fraud by false promise, and fraud by negligent misrepresentation counts that defendants were guilty of malice, fraud or oppression. It did not so find with respect to the negligent design count.

The jury awarded total compensatory damages of $1,722,200[7] against both defendants, apportioned equally between the two.

Following three days of testimony in the subsequent punitive damages phase of the trial, the jury awarded $20 million punitive damages ($10 million against each defendant).

---

[6] Before trial, the trial court held that federal law preempted strict products liability resting on a consumer expectations theory and refused to allow the case to proceed to the jury on that theory. The court also ruled that post- July 1, 1969 failure-to-warn and post- July 1, 1969 fraudulent-concealment liability theories were similarly preempted. Before submitting the case to the jury, plaintiff withdrew the express warranty claim. Plaintiff also withdrew the remaining strict liability design defect claim resting on a risk-benefit theory after the trial court indicated it would give BAJI No. 9.00.6 in connection with the strict liability theory. Plaintiff eventually dismissed additional claims for violation of Business and Professions Code sections 17200 et seq. and 17500 et seq., which the court had severed and stayed upon stipulation of the parties.

[7] The jury found Leslie Whiteley sustained economic damages of $972,200 and non-economic damages of $500,000, and that Leonard sustained loss of consortium damages of $250,000. The court entered judgment in the total amount of $1,689,117 "net" compensatory damages, plus $20 million punitive damages.

On March 31, 2000, the trial court entered judgment on the special verdicts in the total amount of $1,689,117 "net" compensatory damages, plus $20 million punitive damages.

On May 24, 2000, the trial court denied defendants' motions for judgment notwithstanding the verdict and for new trial, and denied their alternative request to remit the punitive damages award. On May 30, 2000, defendants filed a timely notice of appeal from the judgment and the order denying their various posttrial motions. On July 3, 2000, Leslie Whiteley died.

## I. The Immunity Statute and Instructional error

### A. *Instructional error*

Defendants contend that the trial court prejudicially erred in refusing to instruct the jury that it could not base liability upon any conduct by defendants occurring within the 10-year period during which former section 1714.45 (the Immunity Statute) provided complete immunity.[8]

As originally enacted, the Immunity Statute, effective January 1, 1988, granted tobacco companies "complete immunity in certain product liability lawsuits . . . ." (*Myers, supra,* 28 Cal.4th at pp. 831–832.) "[B]etween January 1, 1988 and December 31, 1997, when the Immunity Statute was in effect, supplying pure and unadulterated tobacco products to knowing and voluntary consumers of those products was not subject to tort liability because it *breached no legal duty and thus constituted no tort.*" (*Id.* at p. 837; see *American Tobacco Co. v. Superior Court* (1989) 208 Cal.App.3d 480, 487 [255 Cal.Rptr. 280].)[9] Section 1714.45 was amended, effective January 1, 1998, to delete "tobacco" from the list of consumer items entitled to statutory immunity from product liability actions, and to state explicitly that the statute does not exempt the manufacture or sale of tobacco products by tobacco manufacturers from product liability actions.

In *Myers* and *Naegele,* the Supreme Court discussed the effect of the repeal of the immunity on the liability of tobacco manufacturers before, during and

---

[8] As did the Supreme Court in *Myers, supra,* 28 Cal.4th 828 and *Naegele, supra,* 28 Cal.4th 856, "we use the term 'immunity' rather loosely to describe the effect of a law that declares certain described conduct not to be a legal wrong or tort, and thus not a basis for liability." (*Naegele,* at p. 860, fn. 2.)

[9] During its effective period, the Immunity Statute precluded " 'all product liability actions pending on, or commenced after, January 1, 1988.' " (Former § 1714.45, subd. (c), added by Stats. 1987, ch. 1498, § 3, pp. 5778–5779.) The statute had the effect of shielding tobacco manufacturers from liability for their conduct *before,* as well as during, the immunity period. (*Myers, supra,* 28 Cal.4th at pp. 834–835.)

after the 10-year period the immunity was in effect. (*Myers, supra,* 28 Cal.4th at p. 832; *Naegele, supra,* 28 Cal.4th at p. 860.) In *Myers,* the court held: "The Immunity Statute applies to certain statutorily described conduct of tobacco companies that occurred *during* the 10-year immunity period, which began on January 1, 1988, and ended on December 31, 1997. With respect to such conduct, therefore, the statutory immunity applies, and no product liability cause of action may be based on that conduct, regardless of when the users of the tobacco products may have sustained or discovered injuries as a result of that conduct. That statutory immunity was rescinded, however, when the California Legislature enacted the Repeal Statute, which as of January 1, 1998, restored the general principles of tort law that had, until the 1988 enactment of the Immunity Statute, governed tort liability against tobacco companies. Therefore, with respect to conduct falling *outside* the 10-year immunity period, the tobacco companies are not shielded from product liability lawsuits." (*Myers,* at p. 832.)

In *Naegele,* the court considered "what *forms of conduct* by tobacco companies during the 10-year immunity period come within the protection conferred by the Immunity Statute." (*Naegele, supra,* 28 Cal.4th at p. 860.) The court concluded that the Immunity Statute's broad definition of product liability lawsuits barred actions for fraud, as well as for negligence and manufacture of an inherently unsafe product, provided the lawsuit is seeking damages for personal injury or death caused by the use of "pure and unadulterated" tobacco products. (*Id.* at pp 863–864.) Therefore, the allegation that tobacco companies, during this period, controlled or increased the nicotine content of their cigarettes through blended or high-nicotine tobacco does not avoid the bar of the Immunity Statute "because it does not allege that defendants exposed plaintiff to a risk *other than* those inherent in tobacco products." (*Id.* at p. 865.) However, product liability lawsuits based upon allegations that the tobacco companies manipulated the addictive properties of cigarettes through *additives,* such as " 'control[ling] nicotine delivery to the smoker *through adding ammonia*' " (*id.* at p. 865), are not barred during the immunity period. "The essence of these allegations is that defendant tobacco companies adulterated the cigarettes plaintiff smoked with additives that exposed him to dangers not inherent in cigarette smoking. Because, as we have explained, the statutory immunity does not shield a tobacco company from liability for injuries or deaths caused by something not inherent in the product itself, the Immunity Statute does not bar these claims." (*Ibid.*)

In summary, *Naegele* concluded: "As we hold in the companion case of *Myers, supra,* 28 Cal.4th 828, the Immunity Statute governs conduct of tobacco companies during the immunity period, which began on January 1, 1988, and ended on December 31, 1997. But when, on January 1, 1998, the California Legislature's repeal of that immunity took effect, the Legislature restored the common law principles that had, until enactment of the Immunity

Statute, governed tort liability against tobacco companies. Thus, the Immunity Statute provides no protection to tobacco companies for conduct that occurred before the statute's 10-year period of immunity. [¶] Regarding defendants' conduct during the statutory immunity period, we conclude that the Immunity Statute bars plaintiff's claims, however labeled, where they allege no more than personal injury caused by dangers or risks inherent in the consumption of tobacco products such as cigarettes. But the Immunity Statute does not bar plaintiff's claims that the defendants adulterated the cigarettes plaintiff smoked with additives that exposed him to dangers not inherent in cigarette smoking. Nor does the Immunity Statute shield tobacco companies from liability for conduct outside the immunity period." (*Naegele, supra,* 28 Cal.4th at p. 867.)

The trial here predated the Supreme Court's *Myers* and *Naegele* opinions. Throughout the trial, defendants maintained that they were completely immune from tort liability by virtue of the former Immunity Statute, and at various times requested the court grant them summary judgment, judgment notwithstanding the verdict and a new trial on that basis. Although primarily contending they were immune for conduct occurring before 1988, as well as during the 10 years the statute was in effect, defendants also argued in the alternative that "at a minimum [the court] must exclude all evidence of allegedly tortious conduct occurring between January 1, 1988 and December 31, 1997 (the period during which the original version of the statute was in effect). . . ." The court rejected these arguments. Defendants alternatively requested that the court instruct the jury in accordance with section 1714.45 that "[y]ou may not find [defendants] liable on plaintiff's claims of design defect, negligence, or fraud and conspiracy based on anything that either defendant did or did not do between January 1, 1988 and December 31, 1997. . . ."[10] (Defendants' Proposed Instruction No. 76) The trial court refused to so instruct.

In their motion for new trial, defendants argued the trial court should grant them a new trial on the fraud and punitive damages claims because they

---

[10] In its entirety the instruction requested by defendants read:

"You may not find Philip Morris or R.J. Reynolds liable on plaintiff's claims of design defect, negligence, or fraud and conspiracy based on anything that either defendant did nor did not do between January 1, 1988 and December 31, 1997. It was the policy of California during that period to recognize cigarettes as inherently unsafe products that could nevertheless be lawfully sold because they carried adequate warnings regarding their dangers, and to encourage the continued availability of cigarettes and other tobacco products to those adult consumers who wished to use them. This was accomplished by a law that protected producers or suppliers of cigarettes or other tobacco products from legal responsibility for harms suffered by those who voluntarily consumed such products. That law was repealed as of January 1, 1998, and has no legal effect with respect to conduct since that date, and also has no legal effect with respect to plaintiff's claim for breach of express warranty." (Defendants' Proposed Instruction No. 76, fns. omitted.)

could not constitutionally be held liable for conduct which was nontortious when undertaken. Therefore, they asserted, "the jury could not permissibly hold Defendants liable for fraud or impose punitive damages based in whole or in part on evidence of their alleged conduct during this period." Defendants asserted that the court's refusal to instruct the jury that it must disregard all evidence of defendants' conduct during the 1988 to 1998 statutory immunity period was prejudicial error. The court denied the motion for new trial.

■ Following *Myers* and *Naegele*, it is clear that the trial court erred in refusing to instruct the jury that it could not hold defendants liable for fraud or negligence based upon their conduct during the 10-year period covered by the Immunity Statute, with one narrow exception for any injury caused by the adulteration of the product with additives.

Plaintiff counters that the court was not required to give the instruction proposed by defendants, as that instruction was too broad, did not advise the jury of the exception for ammonia adulteration, and was argumentative. Plaintiff relies upon the well-known rule that: " 'A trial court has no duty to modify or edit an instruction offered by either side in a civil case' and '[i]f the instruction is incomplete or erroneous the trial judge may . . . properly refuse it.' (*Truman* v. *Thomas* (1980) 27 Cal.3d 285, 301 [165 Cal.Rptr. 308, 611 P.2d 902] (dis. opn. of Clark, J.) and cases cited.)" (*Vahey v. Sacia* (1981) 126 Cal.App.3d 171, 178 [178 Cal.Rptr. 559].)

"But this rule is subject to the qualification that it may be reversible error to refuse an instruction which is substantially correct and is unlikely to have misled the jury. (See [*Truman* v. *Thomas, supra,* 27 Cal.3d.] at p. 294 . . . ; *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815, 819 [26 Cal.Rptr. 633, 376 P.2d 561][11] . . . ; *Tobler* v. *Chapman* (1973) 31 Cal.App.3d 568, 586 [107 Cal.Rptr. 614] . . . .)" (*Vahey v. Sacia, supra,* 126 Cal.App.3d at p. 178.)

Moreover, there is no indication here that the trial court rejected the instruction because it was argumentative or incomplete. If it had done so, such defects could easily have been rectified. (See *Vahey v. Sacia, supra,* 126 Cal.App.3d at p. 178.) Rather, the court apparently rejected the instruction in toto because it had concluded that the former statutory immunity had been completely and retroactively repealed. Consequently, it "appears that it would

---

[11] "More specific language in regard to that factual issue would have been desirable, but it is unlikely that the jury would have been misled by the requested instructions, and the trial court did not refuse them because of a lack of specificity but because of its mistaken belief that res ipsa loquitur could not apply under any view of the evidence. It was error to refuse to give the requested instructions . . . ." (*Davis v. Memorial Hospital, supra,* 58 Cal.2d at p. 819; see also *Keena v. Scales* (1964) 61 Cal.2d 779, 785 [40 Cal.Rptr. 65, 394 P.2d 809].)

have been futile to amend the instructions and the principle expressed in *Davis* [*v. Memorial Hospital, supra,* 58 Cal.2d 815 [26 Cal.Rptr. 633, 376 P.2d 561] should apply. [¶] It is therefore necessary to consider whether the failure to instruct . . . was prejudicial." (*Tobler v. Chapman, supra,* 31 Cal.App.3d at p. 586.)

## B. *Prejudice*

■ "With respect to our review of issues relating to [the failure to give requested jury instructions], as well as the question of their prejudicial impact, we do not view the evidence in the light most favorable to the successful [party] and draw all inferences in favor of the judgment. Rather, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to the losing [party] and rendered a verdict in [that party's] favor on those issues as to which it was misdirected. [Citations.]" (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1156 [84 Cal.Rptr.2d 257].)

Consequently, in determining whether the court erred in refusing to instruct the jury that it could not base a finding of tort liability upon defendants' conduct from 1988 to 1998, during the statutory immunity period, we view the evidence in the light most favorable to defendants. (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674 [117 Cal.Rptr. 1, 527 P.2d 353] [jury assumed to believe evidence on which proffered instructions are predicated]; *Freeze v. Lost Isle Partners* (2001) 96 Cal.App.4th 45, 53 [116 Cal.Rptr.2d 520]; *National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 419 [72 Cal. Rptr. 2d 720]; cf. *Blackwell v. Hurst* (1996) 46 Cal.App.4th 939, 943 [54 Cal.Rptr.2d 209]; *Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1607 [28 Cal.Rptr.2d 62].)

■ "That is not to say, however, that a failure properly to instruct a jury is necessarily or inherently prejudicial." (*Logacz v. Limansky, supra,* 71 Cal.App.4th at p. 1156.) The Supreme Court has considered and rejected the theory that an instructional error in a civil case may be inherently prejudicial. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573–580 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*); accord, *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (*Rutherford*).) Instead, *Soule* held that "[i]nstructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule,* at p. 580.) "The reviewing court should consider not only the nature of the error, 'including its natural and probable effect on a party's ability to place his full case before the jury,' but the likelihood of actual prejudice as reflected in the individual trial record, taking into account

'(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' ([*Soule*,] at pp. 580–581.)" (*Rutherford,* at p. 983.) Reversal for instructional error is warranted only where the reviewing court concludes " 'the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule,* at p. 580; accord, *Rutherford,* at p. 983.)

Relying upon *Naegele, supra,* 28 Cal.4th 856, plaintiff contends the verdicts can stand upon evidence that defendants used ammonia additives, adulterating the product to make it unreasonably dangerous. *Naegele* held "that the Immunity Statute's protection . . . does not extend to allegations that tobacco companies, in the manufacture of cigarettes, used additives that exposed smokers to dangers beyond those commonly known to be associated with cigarette smoking." (*Id.* at p. 861.) *Naegele* continued: "The trial court was wrong that the Immunity Statute required it to sustain defendant tobacco companies' demurrer to two causes of action alleged in plaintiff's first amended complaint. In one of these, plaintiff alleges that defendants 'manipulat[ed] the addictive properties of cigarettes via . . . *additives*,' and in the other he asserts that defendants 'control[led] nicotine delivery to the smoker, *through adding ammonia*.' The essence of these allegations is that defendant tobacco companies adulterated the cigarettes plaintiff smoked with additives that exposed him to dangers not inherent in cigarette smoking. Because, as we have explained, the statutory immunity does not shield a tobacco company from liability for injuries or deaths caused by something not inherent in the product itself, the Immunity Statute does not bar these claims." (*Id.* at p. 865.) At the same time, citing our opinion in *American Tobacco Co. v. Superior Court, supra,* 208 Cal.App.3d at page 490, footnote 5, the Supreme Court recognized that allegations that "defendants 'control[led] the nicotine content of their cigarettes . . . by developing high-nicotine tobacco and blended tobacco' " did not survive the statutory immunity. "Because nicotine is naturally present in tobacco, the risks associated with nicotine are inherent in tobacco products. Therefore, an allegation that defendants increased the nicotine content of their cigarettes through blended or high-nicotine tobacco does not avoid the bar of the Immunity Statute because it does not allege that defendants exposed plaintiff to a risk *other than* those inherent in tobacco products." (*Naegele,* at p. 865.)

■ Unlike *Naegele,* which was an appeal from the sustaining of a demurrer, here there was no *separate cause of action* based upon ammonia adulteration. The complaint did contain factual allegations that defendants added ammonia to increase nicotine addiction and cigarette dependency. However, such allegations were contained among numerous others in the negligence and civil conspiracy causes of action. At trial, plaintiff presented evidence of nicotine manipulation through the addition of ammonia and other additives to cigarettes, but such evidence was part and parcel of their fraud and

negligence causes of action and there is simply no way to determine whether or to what degree the jury relied upon such evidence in reaching its verdicts.

Plaintiff also contends any error was harmless, as the judgment rests upon defendants' pre-1988 misconduct and that the "scant" evidence of defendants' misconduct after 1988 and within the statutory immunity period was "insignificant." Plaintiff points out that the number of post-1988 exhibits is small (62), compared to the total number of exhibits introduced by him (977), and that only two post-1988 documents were referred to during closing argument, compared with 43 other pre-1988 documents. Such calculation does not answer the question of prejudice, however, which we assess using the factors set forth in *Soule, supra*, 8 Cal.4th at pages 580–581, as a guide.[12]

1. *State of the evidence.* Although it is not clear that any relevant evidence was *excluded* because of the instruction and defendants did argue that the evidence did not show wrongdoing in the 1990's, nevertheless we believe the nature of the instructional error here was likely to have impaired defendants' ability to put its full case before the jury. Defendants were unable to argue that the jury *could not* consider their conduct during the immunity period in determining their liability for negligent product design or fraud. Defendants were unable to build into their case or argument the reality that they were shielded from liability for 10 years, or 40 percent of the period during which Whiteley smoked. During the liability phase and most clearly during the punitive damages phase, plaintiff argued that defendants had engaged in a continuous course of tortious conduct spanning the decades before Whiteley's birth and continuing even at the time of trial. Such conduct became more egregious over time as more became known about the hazards of smoking.

Although not voluminous, significant evidence relating to defendants' wrongdoing during the immunity period bolstered plaintiff's argument that the tobacco companies continued, up to the date of trial, to misrepresent the hazards of smoking and to dispute causation and the risks of addiction so as to undermine public health messages about smoking. This evidence also constituted powerful support for the punitive damages claim.

Evidence of wrongdoing during the immunity period included the following:

Benowitz testified, based upon his experience and the 1989 Surgeon General's report, as to the effect the tobacco industry's statements disputing causation and addiction have had on public awareness. Benowitz opined that

---

[12] Nor does defendant R.J. Reynolds's argument during the punitive damages phase, that it should not be punished for misconduct that occurred long ago, from the 1950's to the 1970's, amount to a change of defendants' theory of the case on appeal, as plaintiff urges.

"the industry statements have undermined the public health message to the result that people are more in doubt about whether the public health message is correct, and are less likely to take it seriously." He affirmed his belief that "that exists at the present time as well."

The immunity period also featured in plaintiff's causation claim. On cross-examination by defendants, plaintiff's expert Dr. David Burns testified that the risk from smoking declines after a smoker ceases smoking and that had Whiteley ceased smoking in 1985, 13 years before she was diagnosed with lung cancer in 1998, her risk of developing lung cancer would have been less than 50 percent. Plaintiff's experts did not testify that Whiteley's disease resulted solely from pre-1988 smoking. They expressly considered her immunity-period smoking in opining upon disease causation, conceding that if she had stopped smoking in 1985, she likely would not have contracted lung cancer. This testimony focused a spotlight on defendants' conduct during the immunity period, wherein defendants continued to speak and act in ways that undermined the public health message that smoking caused cancer and refused to design a "safer" cigarette.

Plaintiff's also examined William Farone, Ph.D., director of applied research at Philip Morris from 1977 to 1984, who testified in support of plaintiff's negligent design claim that it would have been possible to make a "safer" cigarette by reducing or removing nitrosamines, one of the most carcinogenic substances produced from cigarettes, but that defendants refused to do so.

Plaintiff introduced a document found on the Philip Morris Web site (exhibit No. 1613) to support Farone's methodology in looking at the nicotine-to-tar ratios and his theory that ammonia can be used and was used to manipulate the nicotine-to-tar ratio of cigarettes. Farone testified extensively on other existing, feasible technology and designs that could make cigarettes safer through modifications such as other types of filters and ventilation systems.

Other evidence from the immunity period relating to the negligent design claim included evidence of defendants' failure to design safer cigarettes and involved introduction of evidence of the reduced tar design project (exhibit No. 1078 from 1988); product development consideration of lower tar cigarette design with nicotine removed and added back in;[13] product design including use of higher nicotine tobacco (exhibit No. 758 from 1990); and a submission regarding the Federal Trade Commission method for determining tar, nicotine, and carbon monoxide levels in cigarettes (exhibit Nos. 1095 from 1991, and 759 from

---

[13] These included: exhibit Nos. 167 from 1988, 1107 from 1990, 1102 from 1992, 737 from 1997, and 738 from 1996.

1994 and 1996). Also related to the negligent design claim was evidence purporting to show that defendants knew that light cigarettes were not safer (memoranda regarding smoker compensation for lower tar in cigarettes—from 1989 and 1990 (exhibit Nos. 1085 and 1093), and memoranda regarding alternative cigarette designs in 1988 and 1994 (exhibit Nos. 167 and 240)).

Farone testified that defendants refused to research whether light cigarettes were safer as there was no "whole product" testing performed in the United States; that he was unaware of a carbon filter ever being tried on Marlboro cigarettes, and that other technologies could have been used to improve safety. Also presented was testimony by Benowitz that tests on light and ultralight cigarettes available in the late 1980's or early 1990's were only for taste and did not analyze whether differences other than taste were present.

As evidence of defendants' misrepresentations, plaintiff introduced into evidence a 1992 Philip Morris document, "Tobacco Issues and Answers" (exhibit No. 608), that acknowledged that "smoking is a risk factor for certain human diseases," but argued that causation had not been proved; that secondhand smoke did not cause disease; and that smoking was not addictive. Other evidence introduced by plaintiff included alleged false statements by defendants through press releases issued by the Tobacco Institute in 1988 and 1994 reasserting that the claim that smoking is addictive was unwarranted (exhibit Nos. 386 and 387); that cigarette manufacturers did not manipulate the level of nicotine in cigarettes; and that it was irresponsible to suggest that nicotine is addictive (exhibit No. 387). Also introduced as evidence of false statements was a 1988 letter from R.J. Reynolds stating that "scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking," and referring to the "many unanswered controversies sur-rounding smoking" (exhibit No. 1109). Plaintiff introduced a 1994 R.J. Reynolds advertisement asserting "we do not increase the level of nicotine in any of our products in order to 'addict' smokers" (exhibit No. 593).

Plaintiff introduced evidence of conduct during the immunity period relating to defendants' alleged nicotine manipulation, including: three 1988 R.J Reynolds documents (exhibit Nos. 1110, 744 and 1079); a 1989 Philip Morris document (exhibit No. 168); two 1990 R.J. Reynolds documents (exhibit Nos. 1103 and 758); a 1990 Philip Morris memorandum referring to Philip Morris studies in 1989 and June 1990 (exhibit No. 171); three 1991 R.J. Reynolds documents (exhibit Nos. 1086, 1095 and 1106); a 1992 Philip Morris memorandum discussing 1991 research (exhibit Nos. 175); a 1992 Philip Morris memorandum (exhibit No. 178); and a 1994 Philip Morris document (exhibit No. 184).

In addition to evidence relating to the nicotine manipulation allegations, plaintiff introduced other evidence of defendants' conduct during the immunity period intended to support plaintiff's contention that defendants concealed their knowledge of the physiological effects of nicotine. (See exhibit Nos. 509 [1993 aerosol studies proposal], 174 [1992 sensory technology report], 1100 [1991 Reestablishment of Solubles in Tobacco (REST) program review on controlling nicotine], 1061 [1989 optimal nicotine delivery].)

Plaintiff argued that defendants targeted youth in their advertising and introduced as supporting evidence two 1988 R.J. Reynolds documents (exhibit Nos. 1487, 1488), two 1990 R.J. Reynolds documents (exhibit Nos. 1992 and 641), a 1991 Philip Morris document (exhibit No. 244), and a 1992 report commissioned by Philip Morris (exhibit No. 208).

Plaintiff also introduced evidence of defendants' spending on advertising during the immunity period, in an attempt to link these advertising expenditures to the claims that defendants targeted youth in their advertisements, introducing into evidence a list showing defendants spent more on advertising in 1992 than most major American companies (exhibit No. 625) and eliciting testimony that in 1995 the tobacco industry as a whole spent $800 to $900 million on advertising and $3.9 billion on other promotional activities.

2. *Other instructions.* No other instruction lessened the prejudice of the court's instructional error. There were no other instructions informing the jury that it could not base liability for fraud or negligence upon defendants' conduct during the immunity period and no instruction that punitive damages could not be based upon defendants' conduct during this period.

3. *Counsel's arguments.* Counsel's closing arguments during the liability phase and most powerfully during the punitive damages phase of trial highlighted the prejudicial effect of the failure to properly instruct the jury as to the impact of the Immunity Statute upon defendants' liability during the 10-year immunity period. Excerpts from those closing arguments demonstrate that plaintiff's counsel was able to forcefully argue a continuous course of conduct by defendants from a time before Whiteley began smoking, throughout her entire life as a smoker (and including the 1988–1998 immunity period) during which defendants misled the public (and Leslie Whiteley), undermined the effectiveness of public health messages, and refused to design a safer cigarette.

Plaintiff's counsel argued that defendants' false denial of the link between smoking and lung cancer and their conduct in manufacturing a "controversy" about the medical evidence continued uninterrupted throughout the past 50 years.

"So what are all these other causes? [Defense witness] Dr. Wecker had ideas. It was not eating leafy vegetables. I can't remember. Radon causes it. Compared to smoking, it's a drop in the ocean. But that's not where it is. [¶] So they come to you with a story that lots of things cause it, and they try to link it, . . . to a virus, to air pollution, which does cause it, I suppose, or at least might contribute, or to TB, tuberculosis. They're being extraordinarily misleading. [¶] . . . [¶] *Over the entire 50 years, there has been a common theme, that everything causes it but cigarette smoke.* TB, air pollution, radon, leafy vegetables, asbestos, genetics; it all causes it, but not smoking. [¶] And maybe you're hearing something that sounds familiar, because that's what they have done in this case too. Everything caused it but the smoking. [¶] [Exhibit No.] 456 is the one I referred to. That's 1984—1983, they attacked the idea that it's addictive. [¶] *And it goes on and on.* And the attempt was very clear. The intent was to persuade people what they were hearing was not true, that . . . lung cancer was not caused by smoking. [¶] *And in general, it worked. It worked for many, many people, and it worked with Leslie Whiteley.*" (Italics added.)

"*And we're here now in 2000. . . . [H]ere we are, how many years later? And the same questions are being asked. The same issue is being raised.* [¶] 'We still don't know. We think it's probably a risk. It's not good for you, but we don't really know. And we don't know what it is in cigarettes. And if—gosh, if we only knew what it was in cigarettes, we'd take it out and then everything would be just fine.' [¶] *They're still saying that. And maybe that changed as of 1999.* Philip Morris' website, followed this year by R.J. Reynolds' website, finally acknowledging what the medical community has said, what was established fact. [¶] . . . [¶] Why are we here in 2000, without somebody coming forward and saying—some corporate vice president, the chairman of the board, somebody saying from that witness stand, 'Yes, we know we sell a deadly product. We know it. We admit it. We acknowledge it.' [¶] Because the website doesn't say that either. It says: 'Refer yourself back to the health community.' [¶] By the way, when Dr. Davis was here and Dr. Burns was here and Dr. Benowitz were here, there was an attempt to make them out to be some kind of zealots . . . . [¶] No. They want to keep people from dying. They want to keep people from dying. That's their goal. [¶] So why do we have all this questioning of them and arguing over every point? It's not addictive. It is addictive. Which definition? 'Just admit it. You sell a deadly product. It's addictive.' [¶] 'We'll make it better for some people. Well, we are not sure really if it's better, but we'll tell you that ultralight has less or a light has less.' " (Italics added.)

Counsel argued that the industry had consistently and uninterruptedly managed to maintain the half-truth that " 'the case is not proved' " and " 'to hold the public on [that] middle course.' " "And I submit to you that *they have managed to do that for 50 years.* And now, as we stand here in 2000,

maybe that will change. But during the course of this trial, 3,000 kids began smoking every single day since this trial began." (Italics added.)

Counsel referred the jury specifically to exhibit No. 608, the 1992 Philip Morris document on tobacco issues and answers and to exhibit No. 386, the 1988 press release from the Tobacco Institute, "Claims That Cigarettes Are Addictive Contradict Common Sense," as well as to earlier documents and argued that the "purpose was, to reassure smokers, keep them smoking. [¶] . . . [¶] And that's what has gone on and has been going on."

"And it goes on, Ladies and Gentlemen, and it goes on and it goes on."

Referring to the negligent design claim that defendants refused to make a safer cigarette, plaintiff's counsel argued: "The cigarette people don't recall cigarettes. They make another one. Camel makes Camel Lights and Camel 100 starting about 1977, not too long before Leslie Whiteley began to smoke Camel, and sometime in the early '80s. And she smoked Camels until 1998. [¶] And *they told you that, in those cigarettes, they didn't make a single change from the time they were issued.* And that's what she was smoking. They knew they were extremely dangerous and they were doing all kinds of research you heard about, but they never made a single change. They failed to do a single design change despite what they knew." (Italics added.)

During the punitive damages phase of trial, plaintiff's counsel, during her closing rebuttal, scoffed at the idea that the tobacco companies had "turned over a new leaf" or had changed, arguing that any changes had been forced upon the defendants by state governments and that any true change by the companies was belied by an uninterrupted 50 previous years of blameworthy conduct.

"[W]e're talking about Philip Morris. We're talking about R.J. Reynolds. [¶] And we're talking about them from when they began, and we're talking about information that they now claim, 'Oh, suddenly—oh look, we've come forward. We've put it on our website, the truth. We've put the truth on our website.' [¶] This truth (indicating) was known in 1954. This truth was known in 1964. This truth was known in 1974 and in '84. [¶] And you know what it took? It took 1994, when the State of Mississippi sued them to recover medical expenses—not for punishment, not for personal injury, not for the type of lawsuit we're here for—and force them to finally, finally, say something to the public that wasn't an outright lie or a half-truth. [¶] They made the choice. They made the choice not to do it sooner. What they did was they waited until they got caught. It took a lawsuit, just like it's going to take a lawsuit here, to punish them. [¶] When they came into the first phase of this case, did they come in and say, 'we have some responsibility'?

No. [¶] . . . [¶] . . . We are talking about punishment, and we're talking about deterrence. [¶] You can't look at from 2000 on and say, 'Well, it doesn't matter what we did for the last 50 years.' You can't do that. They cannot be allowed to get away with that. [¶] You send the wrong message to corporate America that it's okay for companies to mislead, to misrepresent, and to do it as long as you want, to kill thousands of people in California, and you don't have to change your ways until somebody catches you and makes you."

Regarding advertisements targeting youth and billboards, plaintiff's counsel argued that the company had done nothing to stop that targeting until 1998, when forced to do so by particular states, and that it had spent in excess of $1 billion dollars in advertising in 1999. "Now, we are not talking about the past. We are talking right now. So think about how much advertising that is. If it's not on a billboard, think about where all of that money is going, and think about why they made that corporate choice. [¶] Those are the kinds of things that you need to deter, decisions like that. Decisions to spend a minimal amount doing what somebody has forced you to do. [¶] And I also asked Ms. Merlo [senior vice-president in corporate affairs for Philip Morris] whether or not Philip Morris could have voluntarily taken down billboards. Did they have that choice [at] any point in time? Of course, they did. Did they keep them up until the second they were forced to take them down? [¶] And what happened? We talked about the fact that before they were forced to take them down all over the place, in all the states under the MSA settlement agreement, that the State of Minnesota required that the billboards come down in that state. [¶] And what did Ms. Merlo say when she was asked as the spokesperson for Philip Morris: 'Will you take them down voluntarily elsewhere? Minnesota is making you do it. Why not take them down elsewhere, take them down in California, take them down elsewhere?' [¶] And what does she say? 'We are absolutely not considering taking down billboards.' [¶] Corporate choice. Their choice. *1998, she's saying this. 'Unless somebody makes us do it, we're not going to do it.'* [¶] All they care about is money. And then 46 states, that's plus the other three that had previously settled and force them to do this. Forced them. Forced them to do this. [¶] And yet, they still manage to decide to spend a billion dollars on advertising and only 100 million on doing the things the states have asked them to do." (Italics added.)

"*And for 50 years, the government hasn't been able to stop them from lying to the American public, from telling these half-truths.* You heard from probably the most famous person with respect to cancer causation, lung cancer, cigarette smoking, who was knighted, Sir Richard Doll. And he said, '1954, it was known.' [¶] And what did they do? They come out and they say, 'It's not true. It hasn't been proven. And don't worry. We'll get back to you with the information. We'll let you know when it's been proven.' [¶] And I don't know if you remember the addiction part. I think that there was

something left out by Mr. Furr. [¶] 'Oh, yes, we admit it's addictive, as that is commonly known, like coffee, not like cocaine or heroin.' [¶] Well, that's not what the evidence was. And yet they're still disputing that. [¶] They were humbled. I heard those words. 'We were humbled. We're humbled before you.' Nonsense. They were caught. They were not humbled. [¶] You wait until you're caught, and now you cry, 'We are sorry.' No. They never did say that part. They said, 'We'll never do it again. We've turned over a new leaf. We've turned over a new leaf. Trust us.' [¶] Ms. Merlo said, 'Trust us. Just give us some time and trust us.' [¶] *They were given 50 years to come forward with the truth, but we're supposed to trust them now.* [¶] They haven't been punished. If you do not find punitive damage against them, they will not be deterred. They will go on continuing to blame other things for people's injuries. [¶] . . . [¶] They are the masters of shaping public opinion and what they want to do is to have you say, 'Okay. We trust you now. *You lied for 50 years*, but we trust you now. We believe you'll be good corporate citizens in the future.' [¶] You have to make sure that they will be good corporate citizens in the future. . . ." (Italics added.)

Clearly, plaintiff's closing arguments in the liability and particularly in the punitive damages phases hinged on his contention that the defendants had continued from the 1950's through the late 1990's in an *uninterrupted course of blameworthy conduct*, consisting of telling half-truths, misleading the public as to the hazards of smoking, creating the perception that there was a "controversy" surrounding the health issues related to smoking, targeting youth with advertising, and refusing to design a safer cigarette. A proper instruction advising the jury that it could not find defendants liable for fraud or negligence based upon its conduct during the last 10 years of that period would have made such argument impossible.

Moreover, defendants could not effectively make their case to the jury as they could not tell the jury that their conduct was protected by law for 10 years.

Nor are we persuaded by plaintiff that the evidence and argument relating to defendants' conduct during the immunity period was merely "cumulative" of other evidence. The point is not that the evidence of blameworthy conduct during 1988 to 1998 was somehow different in character or scope than the conduct that came before. Rather, the point *is* the timing of the conduct, coming as it did during the last 10 years Whitley smoked, and making the case that defendants had neither turned over a new leaf nor changed their behavior, but steadfastly continued with a pattern of obfuscation and manipulation of the truth, misrepresentation, and negligence.

■ 4. *Indications by the jury that it was misled.* The final *Soule* factor, indicating the jury was misled by the instructional error, points squarely

toward finding prejudice here. A close verdict is a key indication that the jury was misled by an instructional error. (See *Soule, supra,* 8 Cal.4th at pp. 570–571; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069–1070 [232 Cal.Rptr. 528, 728 P.2d 1163]; *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].) The verdicts against defendants, following more than a week of deliberations, were close. The jury found in favor of defendants on the conspiracy causes of action and on those counts specifically alleging negligence or fraud occurring *before* July 1969. The jury findings for plaintiff on three fraud counts and on the negligent design count were by the minimum nine-to-three vote. As to the findings upon which the punitive damages were awarded, the jury found defendants had *not* acted with malice, fraud, or oppression as to the negligent design count by a nine-to-three vote. It found defendants had acted with malice, fraud or oppression in connection with the fraud by intentional misrepresentation on a nine-to-three vote and found by 10 to two that defendants had acted with oppression, fraud and malice in connection with the false promise and negligent misrepresentation counts. After the trial on punitive damages, the jury found punitive damages should be assessed against both defendants by an 11-to-1 vote. The closeness of the liability verdicts and the findings of oppression, fraud or malice upon which the punitive damages award must be based, strongly suggests the instructional error was prejudicial. (See *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1055 [1 Cal.Rptr.2d 913, 819 P.2d 872] [nine-to-three and 11-to-1 verdicts against defendants on negligence, and 10-to-2 verdict finding no causation, were inconsistent given the record in the case and strongly suggested prejudice from the failure to instruct on "substantial factor" causation]; *Sandoval v. Bank of America* (2002) 94 Cal.App.4th 1378, 1389 [115 Cal.Rptr.2d 128] [nine-to-three finding on special verdict supports finding instructional error prejudicial]; *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 380 [54 Cal.Rptr.2d 781] [prejudice found where jury deliberated "for nearly seven full days, the individual defendants were found not liable, and the verdict against the City was nine to three"].)

Given the nature of the instructional error and based on the above factors, we cannot find the error harmless but conclude that " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule, supra,* 8 Cal.4th at p. 580.) Consequently, we must reverse the judgment in favor of plaintiff. Whether we remand for a new trial or for entry of judgment in favor of defendants on particular counts depends upon resolution of additional issues raised by defendants as grounds for reversal. We shall address only those claims of error raised by defendants that, if successful, would compel reversal and entry of judgment in their favor on particular counts.

## II. Federal Preemption

Defendants contend that the court prejudicially erred in permitting plaintiff to base liability for fraud on evidence and claims of "neutralization" and "half-truths" subject to federal preemption under the Federal Cigarette Labeling and Advertising Act of 1969 (15 U.S.C. §§ 1331–1340) (the Act). The preemption section of the Act provides: "(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." (Pub.L. No. 91-222, § 2 (Apr. 1, 1970) 84 Stat. 88.)[14]

■ In *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504 [120 L.Ed.2d 407, 112 S.Ct. 2608] (*Cipollone*), the Supreme Court addressed the preemptive reach of the Act in an action by a smoker and her spouse against tobacco manufacturers. The court held the Act preempted state law tort claims based upon a failure to warn regarding smoking and health in advertising and promotions, regardless of how these claims are couched.

Consonant with "the strong presumption against pre-emption," the Supreme Court narrowly construed the precise language of section 5(b) and looked to each of the common law claims raised by the petitioner to determine whether the claim was preempted. (*Cipollone, supra,* 505 U.S. at p. 523.) The court summarized its holding as to the preemptive reach of the Act as follows: "[T]he 1969 Act pre-empts petitioner's claims based on a failure to warn and the neutralization of federally mandated warnings to the extent that those claims rely on omissions or inclusions in [defendants'] advertising or promotions; *the 1969 Act does not pre-empt petitioner's claims based on express warranty, intentional fraud and misrepresentation, or conspiracy.*" (*Id.* at pp. 530–531, italics added.)

Failure-to-warn causes of action were preempted, "to the extent that they rely on a state-law 'requirement or prohibition . . . with respect to . . . advertising or promotion.' Thus, insofar as claims under either failure-to-warn theory require a showing that [defendants'] post-1969 advertising or promotions should have included additional, or more clearly stated, warnings, those claims are pre-empted." (*Cipollone, supra,* 505 U.S. at p. 524.)

■ Causes of action for breach of warranty, intentional fraud and misrepresentation of a material fact by either a false representation or concealment, and conspiracy were not included within the preemptive reach of the Act.

---

[14] The preemption provision of the 1965 predecessor statute was contained in section 5(b) and courts routinely refer to the provisions as "5(b)." (Pub.L. No. 89-92, § 5 (July 27, 1965) 79 Stat. 283; Pub.L. No. 91-222, § 2 (Apr. 1, 1970) 84 Stat. 88.)

(*Cipollone, supra,* 505 U.S. at pp. 528–531.) The Supreme Court held that express warranty claims, whether or not the terms of the warranty were set forth in ads, were not preempted because they were derived from and measured by the terms of the warranty. "Accordingly, the 'requirement[s]' imposed by an express warranty claim are not 'imposed under State law,' but rather imposed *by the warrantor.*" (*Id.* at p. 525.) Fraud claims based upon concealment of material facts were not preempted insofar as they rely on a state law duty to disclose such facts through channels of communication other than advertising or promotion. (*Id.* at p. 528.) Fraudulent misrepresentation claims that "arise with respect to advertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are not pre-empted" because they are "predicated not on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive." (*Id.* at pp. 528–529.)

Defendants do not identify with particularity the testimony or evidence they assert was erroneously admitted. However, their citations to the record indicate they are challenging all evidence, testimony, argument and instructions which allowed plaintiff to make the case that defendants made false statements and affirmative misrepresentations in their advertising, promotions and other public statements asserting that there was a legitimate medical controversy about the health effects of smoking, denying that cigarettes were hazardous, and assuring the public that defendants were engaging in continuing research and would fully disclose all information about the health effects of smoking. Defendants also appear to challenge evidence and testimony that, in reality, they and their agents engaged in a campaign of disinformation, manufactured the medical controversy, did not conduct certain types of research, and concealed and destroyed research linking smoking to health problems.[15]

In ruling on the various preemption related motions, the court limited plaintiff's failure-to-warn and concealment claims to those occurring before July 1, 1969. It also held plaintiff's claim for conspiracy to conceal was preempted and therefore limited to those acts occurring before July 1, 1969. In so doing, it accepted defendants' argument that " 'advertising and promotion' " referred to all of defendants' attempts to communicate with their mass market. The court also barred plaintiff's products liability claim based upon the ordinary consumer's safety expectations, ruling that consumers' safety

---

[15] It is questionable whether defendants have adequately preserved their attack on the evidence on appeal. They fail to identify particular items of evidence or testimony erroneously admitted on grounds of preemption. Their pretrial memoranda on preemption tended to focus on the reliance issue or the conspiracy cause of action, rather than upon the "half-truth" issue they now raise. However, plaintiff does not argue that the issue has not properly been preserved.

expectations could be shaped only by the package warnings. Moreover, when evidence was objected to by defendants on preemption grounds, the objection was usually sustained.[16]

The only specific preemption objection to an item of evidence identified by defendants as overruled by the court was to exhibit No. 507. That exhibit is a note written in the early 1980's by Dr. Tom Osdene, head of biological research and activities dealing with "maintaining the controversy" for Philip Morris. This note ordered documents to be removed from the United States to Cologne, Germany and others to be destroyed. The admissibility of this evidence depends upon the correctness of the court's ruling that preemption did not extend to evidence of "half-truths," such as defendants' falsely assuring the public that research was ongoing and that defendants would fully inform the public about their findings as to the health consequences of smoking, while defendants destroyed research documents and took steps to ensure that research findings were outside the reach of the jurisdiction of the United States.

Defendants argue that plaintiff introduced evidence and argued in support of a preempted "neutralization" claim—that is, that through their advertising, commercial imagery or public communications glamorizing smoking, down-playing its health risks or representing smoking as romantic, youthful or healthy, defendants "neutralized" or diluted or undermined the prescribed federal warnings. However, examples provided by defendants are either of pre-1969 advertisements occurring during Whiteley's formative years, or are not identified by date, but may be inferentially found to be pre-1969 advertisements. Plaintiff's counsel's argument about the glamorization of smoking related to those 1960's ads and was clearly not preempted.[17]

In their reply brief, defendants focus on their claim that the jury instructions on preemption allowed the jury to base its verdict on preempted theories of "neutralization" and "half-truths." They argue that "only 'fraud by intentional misstatement' is not preempted by the 1969 Act." Specifically, defendants contend that over their objection, the court erroneously instructed the jury that a "half-truth" was an intentional misstatement and was outside the Act preemption.

The portion of the fraud instruction challenged by defendants provided in relevant part:

---

[16] Exceptions were exhibit No 507, discussed *ante,* and several 1971–1972 ads admitted to show that despite the Act, some ads did not bear the federally mandated warning.

[17] Indeed, during closing argument, plaintiff's counsel referred to the preemption instruction, acknowledging that Whiteley could not base her action upon advertising after July 1, 1969.

"Conduct may be fraudulent because of an intentional misrepresentation, concealment, a false promise or a negligent misrepresentation. [¶] The essential elements of a claim of fraud by an intentional representation are: [¶] 1. The defendants must have made a representation as to a past or existing material fact *or, while under no duty to speak, nevertheless did so, but did not speak honestly or made a misleading statement or suppressed a fact which materially qualified that stated, either of which constitutes a representation*; [¶] 2. The representation must have been false, or misleading in the way I just described." (Italics added.)

The court also instructed the jury with regard to preemption in relevant part:

"Regardless of any of the other rules of law set forth in these instructions, you must follow the rules of federal law which I shall now give to you. [¶] Because of federal law, you may not base any finding of liability on a determination that after July 1, 1969, the tobacco company defendants should have included additional or more clearly-stated warnings on the packages or in the advertising or promotion of their cigarettes. [¶] Also because of federal law, and except only as stated below, you may not base any findings of liability on the basis that: [¶] (A) Defendant tobacco companies, through their advertising or promotional practices, neutralized, minimized, or undermined the effect of the federally mandated warnings after July 1, 1969, or [¶] (B) Defendant tobacco companies, after July 1, 1969, failed to disclose, or concealed or suppressed, information about the health risks of smoking, including 'addiction.' [¶] The federal law does not limit the potential liability of the tobacco company defendants based on any of the claims about which I have instructed you."

The crux of defendants' preemption argument is that the court erred in admitting evidence and allowing argument supported by this instruction, which includes "half-truths" as a species of intentional misrepresentation. Defendants posit that this theory "necessarily rests on the premise that the defendant made a true statement, *but was required to say more* so that the true statement would not be misleading." Consequently, defendants argue, this instruction permitted the jury to impose fraud liability upon them for failing to say more about smoking and health, permitting liability to be based on matters subject to preemption under the Act.

Our analysis necessarily begins with *Cipollone, supra,* 505 U.S. 504, a case which the court and the parties recognized as "difficult," due not only to the various concurring and dissenting opinions making up a majority on

different parts of the decision,[18] but more fundamentally due to the inherent contradiction at the core of the case.

The parties and the court below described *Cipollone* as presenting a continuum ranging from claims clearly preempted by the Act at one end and claims clearly not preempted at the other. The "half-truths" fraud claim presented here lies toward the middle of the continuum, somewhere between preempted theories of liability (including "failure to warn" and intertwined "neutralization" claims) and theories that were not preempted (including "intentional fraud and misrepresentation" claims). Line drawing is difficult as each side of the continuum has the capacity to swallow the other. The trial court here captured the contradiction in its query of defense counsel: "How do you square these two propositions in the *Cipollone* case? . . . [¶] . . . [¶] *Cipollone* seems to say that misrepresentations for fraud survive 1969 [preemption] but neutralizing the warning labels don't. What do you do when you get a misstatement about health? Does that neutralize the warning or is that fraud? What is the test and what is the line and how do you distinguish . . . ?" Counsel for defendants initially argued that only affirmative misrepresentations of fact that would not have the effect of neutralizing the warning could survive preemption. Counsel suggested a statement that relied upon false science, such as " 'our epidemiological studies demonstrate that smoking has no negative effect on health,' " and which included fraudulent data would be such an affirmative misrepresentation of fact. Defendants' counsel acknowledged that such a statement might neutralize the warnings, but conceded the Supreme Court could not have meant to preempt it. "I don't think that they mean that any statement, no matter how fraudulent, that has the effect of cutting back on the effectiveness of the warnings is nonetheless preempted. Otherwise, they couldn't have ruled as they did in *Cipollone*." Counsel also conceded that the bald statement that " 'there is no health problem with cigarettes' " was close to the line, but likely would not be

---

[18] As both Justices Blackmun and Scalia predicted, implementation of the decision by trial courts has proved difficult. (*Cipollone, supra,* 505 U.S. at pp. 553–554 (conc. & dis. opn. of Blackmun, J.); *id.* at p. 555 (conc. & dis. opn. of Scalia, J.)

"Interpreting this opinion is somewhat complicated by the fact that only part of the opinion is directly supported by a majority of the Court. Parts I through IV of Justice Stevens's opinion represent the opinion of the Court, but parts V and VI of his opinion were joined by only three other Justices. Justice Stevens's opinion as a whole, however, is ultimately supported by a majority of the Court—the composition of the majority just shifts as the issues change. In parts V and VI of the opinion, the plurality stated that some state law claims based on the common law were preempted by the and some were not. See *id.* at 523–24 [112 S.Ct. at 2621]. Justices Scalia and Thomas would have held that all state law claims were preempted by the Labeling Act. See *id.* at 544 [112 S.Ct. at 2631] (Scalia, J., concurring in part and dissenting in part). Justices Blackmun, Kennedy and Souter, on the other hand, would have limited the preemptive effect of the Labeling Act to positive enactments only and not preempted any common law actions. See *id.* at 531 [112 S.Ct. at 2625] (Blackmun, J., concurring in part and dissenting in part)." (*Lacey v. Lorillard Tobacco Company, Inc.* (N.D.Ala. 1997) 956 F.Supp. 956, 960.)

preempted. However, defendants' counsel argued that claims based upon defendants' statements that there was a "controversy" over smoking and health would be preempted as designed to "neutralize" the effect of the federally mandated warning labels. The trial court ultimately disagreed with defendants' line drawing, concluding that the Act's preemptive reach did not extend to an intentional misrepresentation where there was no duty to speak, but where defendants nevertheless did speak falsely or made a statement which was misleading because it suppressed a fact materially qualifying the statement.

In *Cipollone, supra,* 505 U.S. 504, the Supreme Court distinguished between two of the petitioner-smoker's fraudulent misrepresentation theories, finding one preempted and the other not. The petitioner's "neutralization" theory in *Cipollone* alleged that "respondents, through their advertising, neutralized the effect of federally mandated warning labels. Such a claim is predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking." (*Id.* at p. 527.) The court focused upon advertising and promotional materials associating smoking with positive attributes of glamour, romance and youth, and suggesting that smoking is consistent with physical health and well-being. (*Ibid.*) The neutralization theory of "fraudulent misrepresentation is inextricably related to petitioner's first failure-to-warn theory, a theory that we have already concluded is largely pre-empted by § 5(b)." (*Id.* at p. 528.)

*Cipollone* distinguished the petitioner's second fraudulent misrepresentation theory, holding that "claims that do arise with respect to advertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are not pre-empted by § 5(b). Such claims are predicated not on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive." (*Cipollone, supra,* 505 U.S. at pp. 528–529.)

Like the trial court, we view the false assurances that defendants would keep the public informed of their findings regarding smoking and health and the manufacturing of a false controversy regarding the health effects of smoking to be affirmative misrepresentations, outside the preemptive reach of the Act. Moreover, we conclude that misrepresentation by "half-truths" is a species of affirmative misrepresentation and fraud, also on the nonpreempted prong of the *Cipollone* continuum.

We reject defendants' analysis of these claims as preempted because they were based upon industry attempts to neutralize the label warnings. Any statement, even affirmatively false representations about the health effects of smoking, may

have some neutralizing effect on the package warning. As recognized by the trial court and by counsel here, if stretched to its outer limits, the concept of neutralization could preempt virtually all affirmative fraud claims.

To determine whether the fraud claims at issue here are preempted neutralization claims, we examine the neutralization claims at issue in *Cipollone, supra,* 505 U.S. 504. There, the Supreme Court found the allegations "that respondents, through their advertising, neutralized the effect of federally mandated warning labels" were preempted, explaining that these fraud allegations were "predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking. Such a *prohibition,* however, is merely the converse of a state-law *requirement* that warnings be included in advertising and promotional materials." (*Id.* at p. 527.) The alleged neutralizing advertisements described by *Cipollone* were the type that "downplay[ed] the dangers of smoking" and " 'associated cigarette smoking with such positive attributes as contentment, glamour, romance, youth, happiness . . . at the same time suggesting that smoking is an activity at least consistent with physical health and well-being.' " (*Id.* at p. 527.)

 Neutralization claims attack advertisements that give a "false impression" that smoking is innocuous. A reasonable distinction may be made between a neutralization claim that is predicated upon the allegation *that label warnings were neutralized* by advertisements downplaying the dangers of smoking by associating smoking with various positive attributes, and the fraud allegations in this case that defendants, although under no duty to speak, nevertheless did so falsely, manufactured a medical "controversy," assured the public they were conducting research into the health effects of smoking and would advise the public of their findings, but concealed that they were destroying or otherwise hiding documentation of unfavorable results, and refused to conduct certain types of research in the United States.

The "half-truth" claims here are more akin to intentional misrepresentations than to either failure-to-warn claims (to which the neutralization claim was held inextricably tied) or to intentional concealment claims. Indeed, some of the representations, such as the assurances that defendants would keep the public informed of research findings, do not appear to be "half-truths" at all, but rather full blown intentional misrepresentations.

The post-*Cipollone* cases upon which defendants rely are distinguishable. *Lacey v. Lorillard Tobacco Co., Inc., supra,* 956 F.Supp. 956 and *Cantley v. Lorillard Tobacco Co., Inc.* (Ala. 1996) 681 So.2d 1057 involved allegations of suppression and failure to disclose information. Those courts restated *Cipollone*'s holding and expressly acknowledged that the plaintiffs had made

no allegations of false misrepresentation or intentional misstatements by the tobacco defendants. (*Lacey,* at pp. 961–962; *Cantley,* at pp. 1059, fn. 4, 1060–1061.) These cases did not involve allegations of "half-truths."

*Allgood v. R.J. Reynolds Tobacco Co.* (5th Cir. 1996) 80 F.3d 168, 171, was decided on the basis there was no showing of reasonable reliance upon *nonpreempted* claims. *Glassner v. R.J. Reynolds Tobacco Co.* (6th Cir. 2000) 223 F.3d 343, 353–354, held common law fraud and concealment causes of action *survived* preemption, but that no facts had been alleged which could support reasonable reliance by the plaintiff. *DaSilva v. American Tobacco Co.* (1997) 667 N.Y.S.2d 653 [175 Misc.2d 424], recognized that causes of action based upon affirmative misrepresentations or negligent misrepresentations were *not preempted.* (*Id.* at pp. 656, 657.) It described neutralization claims as recognized by *Cipollone, supra,* 505 U.S. at page 527, as tied to advertisements and promotions associating smoking with glamour, youth, and romance. (*DaSilva,* at p. 656.)

Defendants rely upon *Huddleston v. R.J. Reynolds Tobacco Co.* (N.D. Ga. 1999) 66 F.Supp.2d 1370, which they characterize as directly on point. There, summary judgment was granted on the grounds that the plaintiff's Racketeer Influenced and Corrupt Organizations Act (RICO) and fraud claims were preempted. Among numerous allegations, the plaintiff had alleged three specific claims: (1) that, in violation of RICO, the defendant acted in concert with other tobacco companies and marketers to misrepresent their efforts in performing scientific research and fashioned advertising and marketing campaigns to conceal the dangerous health impact of cigarettes; (2) that the defendant intentionally exposed the plaintiff to a hazardous substance, and (3) that the defendant committed fraud in misrepresenting the health hazards of cigarettes. (*Id.* at pp. 1373–1374.) The court granted summary judgment on the fraud claim because the plaintiff could not show reasonable reliance upon the alleged fraudulent misrepresentations or acts of concealment. (*Id.* at p. 1376.) The court also found the RICO and fraud claims were preempted under the Act. (*Id.* at p. 1377.) In so finding, the opinion decried the " 'shotgun pleadings,' " which made no effort to distinguish between preempted and nonpreempted causes of action. (*Id.* at p. 1380.) The court acknowledged that some of the plaintiff's claims (such as the claim for intentionally false advertising) might not be preempted, but observed that these were "[s]prinkled" throughout the complaint and were not stated with particularity, but were inextricably intertwined with other preempted causes of action. (*Id.* at p. 1381.) *Huddleston* does not clearly conclude that the fraud causes of action such as those intentional misrepresentation and "half-truth" claims here would be preempted by *Cipollone.* (See *Huddleston,* at p. 1381.) Rather, it appears to be a response to confusing "shotgun" pleadings. To the extent *Huddleston* may be read to conclude that claims for intentional fraud are preempted, we disagree, as it clearly would be out of line with the holding of *Cipollone, supra,* 505 U.S. 504.

Nor does *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316 [93 Cal.Rptr.2d 36, 993 P.2d 366] (*Etcheverry*) assist defendants.[19] Defendants cite *Etcheverry* for the proposition that the preemption provision of the Act " 'sweeps broadly.' " (*Id.* at pp. 324–325.) *Cipollone* itself recognized a "strong presumption against pre-emption," requiring courts to "narrowly construe the precise language of [the preemption provision of the Act]." (*Cipollone, supra,* 505 U.S. at p. 523.) In context, *Etcheverry* quoted *Cipollone* to the effect that the preemption provision of the Act, unlike its predecessor, " 'sweeps broadly and suggests no distinction between positive enactments and common law . . . .' " (*Etcheverry,* at p. 324.) However, having determined that failure-to-warn claims were preempted, *Etcheverry* also followed *Cipollone* in analyzing particular common law claims to determine whether they were preempted, giving the clause a " 'fair but narrow reading.' " (*Etcheverry,* at p. 335, quoting *Cipollone,* at p. 524;[20] accord, *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1066 [31 Cal.Rptr.2d 358, 875 P.2d 73] [reiterating the presumption against preemption and narrow reading of preemptive provisions].) *Etcheverry* recognized that *Cipollone* had concluded the " '1969 Act does not pre-empt petitioner's claims based on express warranty, intentional fraud and misrepresentation, or conspiracy.' ([*Cipollone, supra,* 505 U.S.] at pp. 530–531 [112 S.Ct. at p. 2625].)" (*Etcheverry, supra,* 22 Cal.4th at p. 335.)

Post-*Cipollone* cases confirm our conclusion that the fraudulent "half-truth" claims here are a species of intentional misrepresentation and are not preempted and that the court correctly instructed the jury on that issue.

■ The California Supreme Court has recognized in a nonpreemption context that " 'misleading half-truths' " are distinguishable from nondisclosures and constitute an exception to the general rule of nonliability for

[19] In *Etcheverry, supra,* 22 Cal.4th 316, operators of walnut orchards sued a pesticide seller, a manufacturer, and others for crop damages which occurred when the plaintiffs applied two pesticides which, when applied in combination, damaged their walnut crop. The pesticide labels had been approved by the Environmental Protection Agency pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. § 136 et seq.), but contained no warning that they should not be used in combination. Using *Cipollone* as the template for its preemption analysis, the California Supreme Court held that state law claims for failure to warn of the risks of using a pesticide were preempted by FIFRA. *Etcheverry* rejected the plaintiffs' "fundamental thesis—that liability under state law for failure to warn is not a requirement for labeling or packaging different from that required under FIFRA . . ." (*Etcheverry,* at p. 327.)

[20] "In determining whether specific claims are preempted by the 1969 Cigarette Act, '[t]he central inquiry in each case,' the high court said, is 'straightforward.' (*Cipollone, supra,* 505 U.S. at pp. 523–524 [112 S.Ct. at p. 2621].) '[W]e ask whether the legal duty that is the predicate of the common-law damages action constitutes a "requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion," giving that clause a fair but narrow reading.' (*Id.* at p. 524 [112 S.Ct. at p. 2621].)" (*Etcheverry, supra,* 22 Cal.4th at pp. 334–335.)

nondisclosure or other failure to act. (*Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1082 [60 Cal.Rptr.2d 263, 929 P.2d 582].) In "a 'misleading half-truths' situation . . . defendants, having undertaken to provide some information . . . , were obliged to disclose all other facts which 'materially qualify' the limited facts disclosed. [Citations].)" (*Id.* at p. 1082.) Such half-truths may constitute "affirmative representations" which are "false and misleading in light of defendants' . . . knowledge . . . ." (*Id.* at p. 1082.) "As one commentator observes, '. . . half of the truth may obviously amount to a lie, *if it is understood to be the whole.*' (Prosser & Keeton, The Law of Torts (5th ed. 1984) Misrepresentation and Nondisclosure, § 106, p. 738, italics added.)" (*Randi W.,* at p. 1082.)

In *Blue Cross & Blue Shield of N.J. v. Philip Morris* (E.D.N.Y. 2000) 113 F.Supp.2d 345 (*Blue Cross*), the district court denied partial summary judgment of claims similar to the intentional fraud and half-truth claims posited by plaintiff here. The defendants sought partial summary judgment of various RICO claims, alleging they were preempted by the Act as addressed in *Cipollone, supra,* 505 U.S. 504. The district court acknowledged that *Cipollone* had held that "determinations of preemption require a careful analysis of whether the legal duty underlying the purported violation is based on state law obligations regarding 'smoking and health' considerations or 'on a more general obligation,' such as the duty not to deceive. [Citation.]" (*Blue Cross,* at p. 387.) The court recognized that intentional fraud could not be supported solely by proof of concealed material facts in advertising or product promotional materials. However, where tobacco defendants had assumed an obligation to accurately and fully present the health risks of smoking to the public, they could be held liable for their failure to tell the whole truth. (*Id.* at p. 388.)

The *Blue Cross* court reasoned: "Defendants *assumed on their own initiative* an express obligation in both their advertisements and in their public statements to smokers generally to accurately present the health risks of cigarette use to smokers, however. This commitment was undertaken at least as early as January 4, 1954, when the defendants published a national advertisement entitled 'A Frank Statement to Cigarette Smokers.' It stated they accepted as a basic responsibility paramount to every other consideration in their business the obligation of researching and accurately presenting the health effects of cigarette use to smokers. [¶] Since that time, the defendants have repeatedly maintained this express obligation through statements released to the public in various advertisements and other promotional releases. By doing so, [the tobacco defendants] expressly assumed (as opposed to a state imposing) the specific obligation to fully and accurately present the health effects of cigarette use to the American public. The Labeling Act does not immunize [the tobacco defendants] from obligations [they have] accepted *on [their] own initiative* regarding the disclosure of 'smoking and health' information,

only those specifically imposed by state law. See, e.g., [*Cipollone, supra,* 505 U.S. at pp. 525–526.] ('While the general duty not to breach warranties arises under state law, the particular "requirement . . . based on smoking and health . . . with respect to the advertising or promotion [of] cigarettes" in an express warranty claim arises from the manufacturer's statements in its advertisements'). [¶] Predicate acts pled under civil RICO, as well as deceptive acts pled under the New York Consumer Protection Act, that are based on fraudulent concealment and nondisclosure of the health effects of cigarettes—made while [the] defendants were falsely claiming in their advertisements and promotions that they were making and would make full disclosure—are not preempted." (*Blue Cross, supra,* 113 F.Supp.2d at p. 388.)

Similarly, in *Magnus v. Fortune Brands, Inc.* (E.D.N.Y. 1999) 41 F.Supp.2d 217, the plaintiffs' failure-to-warn claim was based in part upon a failure to notify the public of the health risks of smoking and in part upon allegations that the tobacco defendants voluntarily assumed a special duty to protect the public by providing information about the effects of tobacco use. (*Id.* at p. 223.) The federal district court held the claim was "preempted under *Cipollone* to the extent it alleges a failure to provide additional warnings post-1969, but *it survives to the extent it alleges a breach of [the] defendants' special duty because, as with an express warranty, the predicate duty is imposed not by the State but by the party assuming the obligation.* [Citations.]" (*Ibid.,* italics added.) Moreover, the plaintiffs' fraud and deceit claims, which included allegations that the defendants issued deceptive press releases, reports and advertisements through the Tobacco Institute, and that they made material misrepresentations to the public regarding the nature and composition of cigarettes, also survived preemption under *Cipollone* as they relied upon a duty not to deceive rather than a duty " 'based on smoking and health.' " (*Magnus,* at p. 223.)

In denying a motion to dismiss, the district court in *Izzarelli v. R.J. Reynolds Tobacco Co.* (D.Conn. 2000) 117 F.Supp.2d 167, held the Act did not preempt a former smoker's common law claims, rejecting the defendant's contention that the plaintiff's core claim was that it had failed to warn of the alleged health effects of smoking. (*Id.* at p. 174.) The court concluded that the plaintiff's claims were not predicated on a duty arising out of smoking and health. (*Ibid.*) Rather, the plaintiff had alleged, among other claims, that individually and in concert with other cigarette companies, the defendant had "entered into a wrongful scheme to defraud the American public into believing that the health and addictive nature of cigarettes had not been established," knowing that no such scientific controversy existed. (*Id.* at p. 170.) In furtherance of this scheme, defendant and others "made fraudulent statements about the health hazards and addictive nature of cigarettes, their knowledge of such health hazards and addictiveness, and their manipulation of the nicotine in cigarettes to increase their addictiveness." The defendant

also "falsely represented that it and the other cigarette manufacturers would investigate and disclose any health hazards of cigarettes even though it did not intend to do so and did not do so." (*Id.* at p. 171.)[21] *Izzarelli* recalled that *Cipollone* " expressly noted that, in enacting the Labeling Act, Congress did not intend 'to insulate cigarette manufacturers from longstanding rules governing fraud.' [Citation.]" (*Id.* at p. 175.) The court concluded that none of the plaintiff's claims were preempted under the Act. (*Id.* at p. 175.) "Izzarelli does not allege that Reynolds's advertising and promotions should have included additional or more clearly stated warnings. Nor does she allege a fraudulent misrepresentation claim that Reynolds's advertising neutralized or minimized the health hazards of smoking. Rather, her claims are based on false representations and concealments of material fact. As such, they are not preempted, even if they were made in advertising or promotion. This is because the predicate duty in such a claim is a state law duty not to deceive, not a duty based on smoking and health. [Citation.]" (*Id.* at p. 175.)

Similarly, here plaintiff's fraud claims based upon defendants' post-1969 conduct were not founded upon allegations that the warning labels were inadequate, that defendants should have made additional or clearer warnings, or that defendants' advertising and promotions neutralized the warning labels by downplaying the health hazards of smoking. Rather, defendants were found liable for their intentional and negligent misrepresentations of material fact and for their false promises violating, not a duty based on smoking and health, but the broader state law duty not to deceive.

Therefore, we conclude plaintiff's claims for fraud, including intentional and negligent affirmative misrepresentations and "half-truths," were not preempted by the Act and the trial court did not err in allowing evidence in support of those claims or in instructing the jury on fraud.

## III. Substantial Evidence Supports Fraud Verdicts

Defendants contend reversal of the fraud verdicts is required on the grounds that (1) plaintifffailed to prove Whiteley saw or heard any specific misrepresentations of fact or false promises that defendants made, (2) plaintiff

---

[21] Among the *Izzarelli* plaintiff's allegations were the following: "Beginning before 1793 and continuing until at least 1998, Reynolds made, directly or indirectly, material false and misleading statements including: it would lead an effort to discover and disclose the truth about the health effects of tobacco; the use of tobacco has not been proven to cause or exacerbate diseases; it did not believe its products were harmful; nicotine was not addictive; and that it did not manipulate the nicotine in tobacco products. . . . Reynolds knew that these representations were false, but deliberately issued them as part of its continuing course of conduct to induce the public to begin and continue purchasing its products and to maintain a market for its products." (*Izzarelli v. R.J. Reynolds Tobacco Co., supra,* 117 F.Supp.2d at p. 171.)

failed to prove Whiteley actually and justifiably relied upon any such misrepresentations or false promises, and (3) the fraud verdicts were based upon a prohibited "fraud on the market" theory.

"[W]e are bound by the rule that when 'a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]" (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253].) Defendants raising a claim of insufficiency of the evidence assumes a "daunting burden." (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328–329 [249 Cal.Rptr. 798].)

"Actual reliance occurs when a misrepresentation is ' "an immediate cause of [a plaintiff's] conduct, which alters his legal relations," ' and when, absent such representation, ' "he would not, in all reasonable probability, have entered into the contract or other transaction." ' [Citations.] 'It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.' (Rest.2d Torts, § 546, com. b, p. 103.)" (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976–977 [64 Cal.Rptr.2d 843, 938 P.2d 903].)

" 'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' [Citations.]" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 [44 Cal.Rptr.2d 352, 900 P.2d 601].)

## A. *Sufficiency of the evidence of actual reliance*

Our review of the record satisfies us that there was substantial evidence that defendants and their agents knowingly engaged in a deliberate scheme to deceive the public, individual smokers and potential smokers (including children and adolescents) about the health effects of smoking. Individually, through their agents, and in concert with others, defendants issued numerous false denials regarding the health hazards of smoking, manufactured a false controversy as to whether smoking cigarettes actually caused cancer or carried other serious health risks, and falsely assured the public that they were diligently engaging in research to find the truth about any health risks of smoking and would promptly disclose to the public their findings, whether good or bad.

The jury could also find that Whiteley heard of these false assurances and denials, both directly and indirectly, and was led to believe, as defendants intended, that smoking cigarettes was "safe" and that it did not cause cancer or other health risks. As a result of that false information, and later, of the distorted judgment brought about by addiction, she either did not hear or did not believe reports of adverse health effects of smoking.

Whiteley testified via deposition that as a teenager growing up, she did not believe that cigarettes could cause serious disease, death or cancer. She was influenced to start smoking at age 13 by peer pressure, a desire to fit in and to look cool, as well as by candy and gum cigarettes and advertisements on TV. "Not just one reason" influenced her to start smoking cigarettes. She recalled cigarette advertisements on TV during her childhood, particularly the Winston song on the Flintstones cartoon series and the "rugged Marlboro Man," and billboards where "everybody looked healthy, white teeth, suntans, having fun." She recalled seeing advertisements for cigarette brands while watching TV during her junior high school years. She had not heard of the "Frank Statement to Cigarette Smokers." Nor could she recall a specific time she heard someone indicating they were speaking on behalf of a tobacco company, but she believed the tobacco companies had said that it was safe to smoke. Although she could not say when she heard this information, she believed the source of this information "must have been a media or—or TV, or I read it somewhere." She believed the tobacco companies, because they manufactured the cigarettes, reasoning: "they made them so they knew what they did to people or didn't do to people, so I believed them."

In high school, she smoked both Winstons and unfiltered Camels. She did not recall seeing a package warning label until she became pregnant in 1988. At that time, she did not believe the government warning that cigarettes could cause serious disease. "I believed that I had also heard that the tobacco companies were saying the government had made them put the labels on the cigarettes, so I believed the tobacco companies were correct. [¶] . . . [¶] In that they—there was nothing wrong with them." Whiteley "believed the tobacco companies" who "denied that it caused cancer . . . ." She did not learn that cigarettes could cause something more serious than a cough in an older person or not running as fast until the day the doctor told her she had lung cancer.

Whiteley tried to quit three or four times for an hour or two and once for an extended time during a vacation to Yosemite with Leonard. She tried to quit the first time at age 15, not because of health consequences, but to save money. She switched to Camel Lights on a full-time basis as an adult. She liked the taste and because they were "light," she believed they had "less whatever they said was in it," specifically less tar. She did not, however,

understand that tar could cause health problems. After switching to Camel Lights, her consumption increased from one to one and a half packs per day.

Whiteley testified she did not believe the manufacturers of the cigarettes she was smoking would sell her something that would kill her. At the time she smoked Marlboros she did not believe that Philip Morris (manufacturer of Marlboro) would sell cigarettes if it knew they caused cancer or death.

Leonard Whiteley testified that he and Whiteley had heard over the years that the risks of cigarettes were not much, if anything. They "heard" this message "in different forms," including from "billboards" and "the tobacco companies in different articles saying that it wasn't bad for you." Leonard remembered the tobacco companies "constantly . . . telling us they were safe." Although Leonard had read the package labels and had heard something to the contrary, too, he never paid much attention to the labels and did not believe it was necessary to quit. They had heard "people say one thing and people say the other thing." Leonard could not be precise as to a specific statement, but he heard on the news and all the time, the pros and cons of cigarette smoking—the tobacco companies saying that cigarettes were safe and the government saying to the contrary. When a doctor told him he was "on a fast road to emphysema," Leonard tried to convince Whiteley to quit, but she told him "she didn't have a problem with it . . . because she would smoke light cigarettes." After Leonard was diagnosed with emphysema in 1994, Whiteley told Leonard she thought a light cigarette was "healthier" than a full-flavored cigarette.

The foregoing supplies substantial evidence that Whitely saw and heard statements by defendants or their agents relating to the health risks of smoking.

In 1988, when she saw warning labels, Whiteley believed the tobacco companies rather than the government about the health hazards of smoking. The jury was entitled to find that by this time, in her addicted state, Whiteley was easy prey for defendants' disinformation campaign and readily believed the industry's misrepresentations and distortions.

As part of their challenge to the sufficiency of the evidence of Whiteley's reliance, defendants contend that the evidence did not show that Whiteley heard any *specific* misrepresentation or false promise made by either defendant. They assert "it is not enough that the plaintiff heard the alleged misrepresentation at some unidentified time from some unidentified source. Instead, the plaintiff must identify a *specific* misrepresentation that was *actually communicated* to the plaintiff (directly or indirectly)."

Contrary to defendants' contention, Whitely did not have to prove that she saw or heard any specific misrepresentations of fact or false promises

that defendants made or that she heard them directly from defendants or their agents. It was sufficient that the statements were issued to the public with the intent that they reach smokers and potential smokers and that Whiteley, as a member of the intended target population, heard them. The jury was correctly instructed: "One who makes a misrepresentation or false promise or conceals a material fact is subject to liability if he or she intends that the misrepresentation or false promise or concealment of a material fact will be passed on to another person and influence such person's conduct in the transaction involved." "A person has reason to expect that misrepresentation, false promise or nondisclosure of material fact will be passed on to another person and influence that person's conduct if he or she has information that would lead a reasonable person to conclude that there is a likelihood that it will reach such person and will influence his or her conduct in the transaction involved." "Subject to liability means that the defendant is liable if all of the other essential elements of the claim of fraud are established. [¶] One who makes a misrepresentation or false promise or conceals a material fact with the intent to defraud the public or a particular class of persons is deemed to have intended to defraud every individual in that category who is actually misled thereby."

The Restatement Second of Torts, section 533, states the relevant principle: "The maker of a fraudulent misrepresentation is subject to liability . . . to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions involved." (See *Geernaert v. Mitchell* (1995) 31 Cal.App.4th 601, 605 [37 Cal.Rptr.2d 483] ["if defendant makes the representation to a particular class of persons, he is deemed to have deceived everyone in that class"]; *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1098 [23 Cal.Rptr.2d 101, 858 P.2d 568] [confirming the general rule, but noting it did not apply where the plaintiff was unaware of the misrepresentation]; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 219 [197 Cal.Rptr. 783, 673 P.2d 660] [applying the general principle to misleading advertising]; *Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1548 [76 Cal.Rptr.2d 101] [following *Geernaert v. Mitchell, supra,* 31 Cal.App.3d 601]; cf. *Gawara v. United States Brass Corp.* (1998) 63 Cal.App.4th 1341, 1351, 1355 [74 Cal.Rptr.2d 663] [evidence did not show indirect reliance].)

Although defendants may not have stated unequivocally that cigarette smoking was absolutely "safe," their statements were intended to reassure smokers and potential smokers about the health hazards of smoking and to convey that safety message. That was exactly the message Whiteley received. Defendants' and their agents' multifarious misrepresentations regarding the

unsettled state of knowledge and the unreliability of any link between cigarette smoking and serious disease were made with the intention and expectation that these misrepresentations would circulate among and influence the conduct of all smokers and prospective smokers. They were heard by or passed on to Whitely, who believed them. When she eventually read contrary information on the cigarette label, she discounted it as being from the "government," knowing that the tobacco industry was saying it was "safe" to smoke cigarettes. This brings her within the cited rule.

B. *Sufficiency of the evidence of justifiable reliance*

1. Defendants contend Whiteley's reliance was unreasonable, as she was made aware of the hazards of smoking from many sources, including the Surgeon General's warnings on cigarette packages as well as from her doctors, relatives, teachers and friends. Consequently, defendants argue that Whiteley was adequately informed of the risks of smoking and that ignoring these warnings rendered her reliance unreasonable.

Defendants' one-sided characterization of the evidence does not credit Whiteley's testimony that she did not know smoking could cause lung cancer or anything more serious than a cough or low birth weight. They attempt to portray plaintiff's reliance evidence as showing that Whiteley ignored the Surgeon General's warning and other warnings because of her belief that the government " 'wouldn't let [cigarette manufacturers] produce' cigarettes if they were dangerous." As described above, this was not the sole or even the primary basis for Whiteley's reliance.

Defendants' selective rendering of the facts refuses to credit Whiteley's deposition testimony that she did not notice package warnings until she became pregnant (when she first saw a warning regarding low birth weight) and that she did not know that smoking posed a serious health risk until she was diagnosed with lung cancer.

Defendants also ignore other evidence of the information environment in which Whiteley began smoking and continued smoking. Plaintiff presented evidence that during the time Whiteley grew up, began smoking, and became addicted to cigarettes, she was not told by her parents, teachers, doctors or others that smoking was a serious health hazard. She was not told by her parents that smoking could cause illness, death, or any health risk. Although Whiteley was suspended for smoking in high school, the suspension came because she broke a school rule. Susana Arce, the dean who suspended Whiteley for smoking, did not tell Whiteley she should not smoke because of any health consequences. At the time, Arce was not herself aware that smoking caused cancer. Nor was there a high school course relating to health

at that time. While Whiteley's obstetrician Dr. Richardson testified he would have communicated to Whiteley that she should stop smoking, Whiteley testified that neither Richardson nor anyone in his office ever said anything to her about whether she should continue or discontinue smoking during her pregnancies. Nor did she recall ever reading any pamphlets on the subject in his waiting room. Any factual conflict presented by this testimony was for the jury to resolve.

Whiteley testified she believed defendants' representations that cigarettes were safe and, when she did notice the label, she believed defendants' statements that the labels were something the government made them do—sticking the government's nose where it did not belong—which was exactly the message defendants worked to deliver. Defendants ignore the evidence that Whiteley believed their disavowal of the Surgeon General's warnings and their insistence that the health case against smoking had not been proved. They ignore evidence that Whiteley believed them when they held themselves out as the "people who know the most about cigarettes," and evidence that, through the Tobacco Institute, defendants encouraged smokers like Whiteley to be skeptical about the "substance" of the Surgeon General's report "and its source."

Defendants ignore testimony by expert witness Richard W. Pollay bearing upon whether it was reasonable to assume Whiteley never saw the label warnings. Pollay testified that teenagers generally ignore all fine print in ads, warnings included, and that Whiteley may never have "attended" to the warning because the behavior of smoking, including handling the pack of cigarettes, "is so habituated a routine that one . . . doesn't even need to look at the pack while handling it and getting a cigarette . . . ." (Accord, *Williams v. Philip Morris, Inc.* (2002) 182 Ore.App. 44 [48 P.3d 824, 835, fn. 15], judgment vacated on other grounds and case remanded by *Philip Morris U.S.A. Inc. v. Williams* (2003) 540 U.S. 801 [157 L.Ed.2d 12, 124 S.Ct. 56][22] ["Defendant argues that the only message that it is certain that Williams received was the health warning on each pack of cigarettes. There is evidence that Williams handled the packs in such a way that he seldom saw the warning. More significantly, when his wife drew his attention to the warning, Williams responded, 'This is what the Surgeon General says, it's not what [the] tobacco company says.' The existence of the warning was only one factor for the jury to consider in determining whether Williams reasonably relied on defendant's representations"].) Defendants also ignore Philip Morris's admission in 1985 that "smokers seem not to 'read' cigarette ads."

---

[22] The Supreme Court vacated the judgment and remanded the case for further consideration in light of *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513], regarding the excessiveness of punitive damages. (*Philip Morris U.S.A. Inc. v. Williams, supra,* 124 S.Ct. 56.)

Defendants ignore Dr. Richardson's observation that, "I don't think Leslie is very sophisticated and very knowledgeable about a lot of things."

They also ignore Benowitz's testimony about the readiness of addicted smokers to believe anything that will enable them "to find some way to keep on smoking without having to quit."

" 'Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent.' (*Seeger v. Odell* (1941) 18 Cal.2d [409,] 414 [115 P.2d 977].) 'Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man.' (*Id.* at p. 415.) 'If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery.' *(Ibid.;* *Gray v. Don Miller & Associates, Inc., supra,* 35 Cal.3d at p. 503 ['the issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience'].)" *(Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th 1226, 1239–1240.)

Taking into account Whiteley's circumstances (including her lack of sophistication), the evidence that she was addicted to cigarettes, her own testimony (supported by the testimony of family members, Dean Arce, and others) that no one had ever told her smoking could lead to serious health problems or to cancer, and her understanding that the defendant tobacco companies that made the cigarettes had said that smoking was "safe," we cannot conclude as a matter of law that no reasonable juror could conclude her reliance was not justified. (Accord, *Williams v. Philip Morris, Inc., supra,* 48 P.3d 824, 835, judgment vacated on other grounds and case remanded by *Philip Morris U.S.A. Inc. v. Williams, supra,* 540 U.S. 801 [157 L.Ed.2d 12, 124 S.Ct. 56].)

2. In postbriefing letters, defendants point to cases holding that a plaintiff is unable to show justifiable reliance upon fraudulent concealment by tobacco companies of the health risks of smoking because the health risks of smoking are commonly known.

"While the common knowledge doctrine in some jurisdictions may operate as a definitional defense to a strict liability claim, it plays no similar role in a fraud context. Actionable fraud occurs when the defendant makes a materially false statement with the intent to induce reliance by the plaintiff who justifiably and detrimentally relies upon the statement. [Citation.] Common knowledge provides no definitional defense to the tort. Common knowledge relates to fraud, if at all, by undermining proof of justified reliance upon misinformation. It would seem, therefore, that a fact-finder should examine

the extent of common knowledge in comparison to the alleged convincingness of the misrepresentation. Even common knowledge does not automatically negate the justifiability of reliance; it just introduces a powerful argument against reasonableness." (*Hill v. R.J. Reynolds Tobacco Co.* (W.D.Ky. 1999) 44 F.Supp.2d 837, 846; *Glassner v. R.J. Reynolds Tobacco Co., supra*, 223 F.3d 343, 353–354.)

We agree with those courts that have expressed the view that, having asserted for decades that the relationship between smoking and cancer or other serious health risks had not been established, defendants cannot persuasively argue that members of the general public had superior knowledge of these health hazards and are therefore deprived of legal recourse. (See, e.g., *Insolia v. Philip Morris, Inc.* (7th Cir. 2000) 216 F.3d 596, 598 ["If there were such a thing as moral estoppel, the outcome of this appeal would be plain. For decades tobacco companies have assured the public that there is nothing to fear from cigarettes, yet they now slough off lawsuits like this one by professing that everybody knew all along that smoking was risky. In taking this litigation stance, the cigarette makers either are suffering from amnesia or are acknowledging that their propaganda over the years has been ineffectual"][23].)

Defendants point to rulings of other courts based on different evidence, and in different contexts, to argue that as a matter of law the health risks of smoking were commonly known. The cases defendants cite almost always were determined on the pleadings or upon summary judgment. None of the cases cited has the extensive factual record presented during the course of this lengthy trial. For example, defendants cite the statement in *FDA v. Brown & Williamson Tobacco Corp.* (2000) 529 U.S. 120 [146 L.Ed.2d 121, 120 S.Ct. 1291], that when Congress enacted legislation regarding smoking and health on six different occasions since 1965, "the adverse health consequences of tobacco use were well known, as were nicotine's pharmacological effects." (*Id.* at p. 138.) That case, an appeal following summary judgment,

---

[23] *Insolia v. Philip Morris, Inc., supra,* 216 F.3d 596, upheld summary judgment for the defendant tobacco companies on the plaintiff smokers' strict liability claim and reversed summary judgment for the defendants on the negligence claim. On the cause of action for strict liability, the standard was the ordinary consumer rather than the fraud standard, which measures reasonableness in light of the individual plaintiff's knowledge and circumstances. Nevertheless, the *Insolia* court treated the matter as one of *fact*, observing: "Based on this particular evidentiary record, no reasonable trier of fact could find for the plaintiffs that the ordinary consumer in 1935 and in the early 1950's did not appreciate the health risks of smoking. *This decision does not foreclose the possibility that other plaintiffs might prevail on a strict liability claim against the tobacco industry. Another record in another case might be different. Another plaintiff might marshal better evidence that the haze of the tobacco companies' propaganda obscured whatever health hazards were known to the average consumer.*" (*Id.* at p. 603, italics added.) We believe plaintiff on the record before us has marshaled that "better evidence" on the fraud claims.

does not hold that in the 1960's the link between smoking and cancer was well known among the public. Rather, the statement was made in the context of determining that Congress had intended to foreclose Food and Drug Administration regulation of tobacco as a drug. In that context, the holding is limited to a ruling that some smoking hazards were well known to Congress and to the public health community. (Accord, *Little v. Brown & Williamson Tobacco Corp.* (D.S.C. 2001) 243 F.Supp.2d 480, 494, fn. 16.)

▮ Several courts confronting evidence of a defendant's fraud have treated the defendant's common-knowledge defense as a question of *fact*, not only as to fraud and misrepresentation claims, but in some cases even as to product liability or failure-to-warn causes of action, where the "common-knowledge" doctrine may appropriately operate as a defense to strict liability. (See *Glassner v. R.J. Reynolds Tobacco Co., supra,* 223 F.3d 343, 353 ["[a]lthough common knowledge may relate to fraud by way of undermining proof that reliance on a material misrepresentation was justified, it is not an absolute defense; we must look to the particular information within the common knowledge of the ordinary person and to the specific allegations of misrepresentations or concealment"];[24] *Tompkin v. American Brands* (6th Cir. 2000) 219 F.3d 566, 572 [question of fact in products liability action whether risk of developing lung cancer was common knowledge from 1950 to 1965]; *Insolia v. Philip Morris, Inc., supra,* 216 F.3d 596, 603 [based on particular evidentiary record, common knowledge of health risks warranted summary judgment on the plaintiffs' strict liability claim, but decision does not foreclose the possibility that other plaintiffs might prevail on a strict liability claim should those plaintiffs "marshal better evidence that the haze of the tobacco companies' propaganda obscured whatever health hazards were known to the average consumer"]; *Hearn v. R.J. Reynolds Tobacco Co.* (D.Ariz. 2003) 279 F.Supp.2d 1096, 1106–1108, 1112–1113 [concluding that the common-knowledge doctrine did not defeat either the plaintiffs' product liability claims or their fraudulent concealment or false misrepresentation claims, the court refused to take judicial notice that health risks associated with cigarette smoking were common knowledge, recognizing the question was one for the trier of fact]; *Little v. Brown & Williamson Tobacco Corp., supra,* 243 F.Supp.2d 480, 494 [in products liability action, it was a jury question whether all risks associated with cigarette smoking were common knowledge before 1988]; *Hill v. R.J. Reynolds Tobacco Co., supra,* 44 F.Supp.2d 837, 846 [common knowledge provides no definitional defense to the tort of intentional misrepresentation. A

---

[24] *Glassner v. R.J. Reynolds Tobacco Co., supra,* 223 F.3d 343, rejected the trial court's reasoning that the plaintiff could not prove common law fraud because he could not show the decedent smoker's reliance was justifiable in light of the common knowledge of the health risks of smoking. The *Glassner* court nevertheless upheld dismissal of the common law fraud claim on the grounds that the plaintiff had "alleged no facts whatsoever that would support a finding that his decedent relied on [the] Defendants' alleged misrepresentations and conceal-ment." (*Id.* at p. 353.)

fact finder should examine the extent of common knowledge in comparison to the convincingness of the misrepresentation to determine the reasonableness of reliance]; *Wright v. Brooke Group Ltd.* (Iowa 2002) 652 N.W.2d 159 [The Iowa Supreme Court certified questions of law regarding liability of cigarette manufacturers to smoker under Iowa law, but declined to answer questions regarding common knowledge in the context of tort and warranty liability claims because they are questions of fact or "require factual determinations that are beyond the scope of a certified-question proceeding." (*Id.* at p. 182.) "Generally speaking, consumer knowledge is merely one factor in assessing liability for design defects or for failure to warn of product risks. . . . In the absence of a factual finding with respect to the common knowledge of consumers during the relevant time frame, we cannot determine whether such knowledge would, as a matter of law, preclude liability under the principles set forth in the Products Restatement." (*Id.* at pp. 182–183.)]; *American Tobacco Co. v. Grinnell* (Tex. 1997) 951 S.W.2d 420, 437 [40 Tex.Sup.Ct.J. 658] [on summary judgment, held that although common-knowledge defense barred survivors' strict liability marketing defect and implied warranty claims based on general health dangers of smoking, it did *not* bar claims based on addictive qualities of cigarettes. Fraud and misrepresentation claims failed where, although *the plaintiff could conceivably have relied* on ads from the 1970's and 1980's, the evidence (including the plaintiff's deposition testimony) established factually that he did not rely on manufacturer's advertisements]; *Miele v. American Tobacco Co.* (2003) 2 A.D. 3d 799 [770 N.Y.S.2d 386], [issue of *fact* as to whether risks of smoking were common knowledge when wife began smoking precluded summary judgment on failure-to-warn claim].)

Defendants primarily cite *Soliman v. Philip Morris Inc.* (9th Cir. 2002) 311 F.3d 966 (*Soliman*), and subsequent federal court cases following *Soliman*,[25] for the proposition that common knowledge of the risks of smoking as a matter of law precludes plaintiff from proving Whiteley's reasonable reliance upon defendants' fraud and misrepresentations. In *Soliman,* the Ninth Circuit affirmed the dismissal of a plaintiff smoker's action against a cigarette manufacturer as barred by the statute of limitations. *Soliman* held the smoker's cause of action for nicotine addiction accrued for limitations purposes on the date he should have known about the addiction (*id.* at

---

[25] (See *Taylor v. Philip Morris, Inc.* (N.D.Cal. 2003), No. C03-0758 MMC (PR) [2003 U.S.Dist. LEXIS 18807, p. 7] [judgment on the pleadings affirmed as the plaintiff, who alleged he had suffered 42 years of physical and mental addiction, " 'is charged with the knowledge' of nicotine's addictiveness, and hence his addiction, at a point long ago in his smoking history."]; *In re Molina-Velez v. F.J. Reynolds Tobacco Co* (D.Puerto Rico 2003) 286 F.Supp.2d 185 [judgment on pleadings on grounds of statute of limitiations upheld. In light of common knowledge of smoking hazards, it strains credulity that family of smoker who had died 15 years before claim was filed had no opportunity to make the connection between smoker's smoking, chronic illness, and death].)

pp. 972–973), and that he could not justifiably rely on alleged fraudulent concealment by the defendant (*id*. at p. 975). In so ruling, the court stated, "California law presumes a plaintiff's awareness that smoking causes addiction and other health problems. . . . Purported reliance on the industry's failure to disclose those facts is therefore not justifiable." (*Id*. at p. 975, citations omitted.)

We believe defendants have waived any claim based upon the asserted "common knowledge" of the health hazards of smoking by failing to raise it in the trial court. Furthermore, *Soliman, supra*, 311 F.3d 966 is neither controlling nor persuasive on the point.

(a.) Defendants assert in the facts section of their opening brief that "there was uncontroverted evidence that the public was aware of the risks of smoking, including habituating or addictive qualities, long before [1972]." However, they did not assert any such specific "common-knowledge" argument as an independent ground for reversal of the fraud verdicts in their opening brief on appeal, independent of their assertion that the record did not support the jury's factual finding that Whiteley's reliance was reasonable, given what she knew and the information available to her. The closest defendants come to belatedly raising the issue during the briefing period is in their closing brief where they argue that "Whiteley was made aware that cigarette smoking can pose health risks" from a variety of sources, including common knowledge.[26]

Moreover, defendants did not assert at trial that Whiteley was *presumed* to be aware of the dangers of smoking so that she could not prove justifiable reliance. They have consistently acknowledged that justifiable reliance is a jury question, and have argued that Whiteley "failed to prove justifiable reliance"—not that California law precluded her (and any other smoker) from proving it. Nor did defendants argue at trial that Whiteley was barred from proving that her reliance was justified.

Upon our invitation, defendants have pointed to portions of the trial court record where they contend they raised the issue of "common knowledge" as distinct from their claim that, as a *factual* matter, Whiteley's reliance was not justifiable in light of the information she possessed. Defendants cite to the following:

---

[26] In their reply brief, defendants argue: "In short, from the Surgeon General's warnings, from her family, friends, and physicians, and from the type of common knowledge that is accessible to every person (see *Barker v. Brown & Williamson Tobacco Corp.* (2001) 88 Cal.App.4th 42, 50 [105 Cal.Rptr.2d 531] ['it has been a matter of common knowledge since at least 1965 that cigarette smoking is not healthy']; . . . , Ms. Whiteley was made aware that cigarette smoking could pose health risks. As a matter of law, it cannot be justifiable under those circumstances for Ms. Whiteley to have relied solely on an unidentifiable 'belief' to the contrary."

(1.) *Defendants' Eighth Affirmative Defense (Commonly Known Risks).* "To the extent that Plaintiffs' claims are based on an alleged *duty to disclose the risks* associated with cigarette smoking, such claims are barred because, to the extent such risks exist, those risks are, and always have been, commonly known." (Italics added.) This affirmative defense did not go to the fraud causes of action, but to the cause of action asserting a post-1969 "failure to disclose" or "failure to warn" of the risks of smoking. The court ruled in defendants' favor on this cause of action, which was not presented to the jury. (See *ante*, p. 650, fn. 6.)

(2.) *Defendants' Memorandum in Support of Motion for Judgment Notwithstanding the Verdict (JNOV).* We note this document is a postverdict argument and, as such, does not timely raise the issue. Moreover, as we read the "common-knowledge" argument presented here, the argument is not distinct from defendants' claim that plaintiff "still did not show that Ms. Whiteley's reliance was *reasonable under the circumstances*"—impliedly conceding that such reliance could be shown on proper facts. Indeed, defendants argue in a footnote that Whiteley's reliance could not have been justified because, despite the federal warnings, "she failed to conduct any sort of investigation to determine the veracity" of the statements she allegedly heard from defendants. Finally, this JNOV memorandum conflates product liability with fraud and interjects defendants' preemption argument— "Congress has deemed the post-1969 Surgeon General's warnings to be legally sufficient to apprise smokers of the dangers of smoking cigarettes"— despite the express holding of *Cipollone, supra,* 505 U.S. 504, that the 1969 Labeling Act did *not* preempt claims based upon fraud and misrepresentation.

(3.) *Defendants' Reply Memorandum in Support of Tobacco Defendants' Motion for Summary Judgment/Summary Adjudication of Issues.* "[B]eginning in 1969, at least three years before [Whiteley] smoked her first cigarette, the warnings required by the Act were sufficient *as a matter of law* to apprise consumers of the dangers of smoking." This sentence is included in an argument entitled "ANY CLAIM BASED ON FAILURE TO WARN IS PREEMPTED." As noted before, defendants were granted summary adjudication on their post- July 1, 1969 failure-to-warn and post- July 1, 1969 fraudulent concealment liability theories. This reply memorandum neither raises nor addresses a universal "common-knowledge" defense to the fraud and misrepresentation causes of action.

Indeed, that defendants were not arguing below that "common knowledge" *as a matter of law* precluded Whiteley from showing justifiable reliance is underscored by defendants' request for BAJI No. 9.00.6 in connection with plaintiff's strict product liability causes of action. BAJI No. 9.00.6 requires the jury to determine as a *question of fact,* whether "the product is known to

be unsafe by the ordinary consumer, who has the ordinary knowledge common to the community . . . ."

We conclude that by failing to adequately raise the theory in the trial court, defendants have waived any argument that "common knowledge" of the hazards of smoking as a matter of law precludes cigarette smokers from reasonably relying upon defendants' false statements and misrepresentations with regard to those risks.

(b.) In any event, we find *Soliman, supra,* 311 F.3d 966 is unpersuasive on this issue. Decisions of the federal courts are not controlling on questions of state law. (*East Quincy Services Dist. v. General Accident Ins. Co.* (2001) 88 Cal.App.4th 239, 246 [105 Cal.Rptr.2d 694].) Nor does *Soliman's* presumption that California plaintiffs have known of the hazards of smoking since 1988 bear on defendants' misconduct before 1988 during the period when Whiteley began smoking and became addicted to defendant's cigarettes. The case was decided on the pleadings under the defendants' assertion of a statute of limitations defense. "At the most, *Soliman* stands for the proposition that a person who suffers harm from a product is thereby put on notice that an earlier representation that the product will cause no harm was false." (*Brandon G. v. Gray* (2003) 111 Cal.App.4th 29, 36 [3 Cal.Rptr.3d 330].)

The statute of limitations is not at issue here. Nor did the *Soliman* court have before it the considerable evidence before the jury here that the tobacco industry's fraud prevented the public from knowing the serious health hazards of smoking and that no such "common knowledge" existed. We believe the question of whether "common knowledge" of smoking's true hazards existed during the relevant time periods in this case, had it been properly raised, would have presented a jury question.

Moreover, *Soliman* does not acknowledge the impact of the Legislature's amendment of section 1714.45 to repeal the former immunity and allow smokers to sue the industry. The legislative history of the amendment refers to the grant of immunity in 1987 and observes, " 'Evidence has now become available showing tobacco companies may have deliberately manipulated the level of nicotine . . . to create and sustain addiction . . . [and] have systematically suppressed and concealed material information and waged an aggressive campaign of disinformation about the health consequences of tobacco use.' " (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 67 (1997–1998 Reg. Sess.) Apr. 8, 1997, pp. 1–2; Sen. Rules Com. 3d reading analysis of Sen. Bill. No. 67 (1997–1998 Reg. Sess.), Apr. 16, 1997, p. 3.) In the Senate Judiciary Committee report on the bill, the California Medical Association stated in support of the bill that " ' "[o]ver the last decade we have learned much regarding the addictive nature of tobacco and the industry's intentional efforts to mislead the public on the health effects of tobacco. . . ." ' " (See *Myers, supra,* 28

Cal.4th at p. 853, fn.2 (dis. opn. of Moreno, J.).)[27] Although the majority in *Myers* concluded this statement of the author's view did not evidence an intent to make the repeal of section 1714.45 retroactive, and discounted it as reflecting the view of a single legislator, we think it helps to highlight *Soliman*'s narrow perspective, which failed to consider the repeal of the statute and the reasons therefore as impacting its common-knowledge determination.

*Barker v. Brown & Williamson Tobacco Corp., supra,* 88 Cal.App.4th 42, also relied upon by defendants, is similarly inapposite. There, the plaintiff had waited until some 35 years after his father's 1962 death from smoking to bring the action. The trial court granted a demurrer and the Court of Appeal affirmed. The court rejected the claim that the defendant's fraud tolled the statute of limitations, concluding that the plaintiff had waived the claim by failing to raise it below. Having no evidence before it, the court then stated in dicta: "Regardless of any concealment by [the defendant], it has been a matter of common knowledge since at least 1965 that cigarette smoking is not healthy. That is when Congress required health warnings on cigarette packages. (Federal Cigarette Labeling and Advertising Act of 1965 (Pub.L. No. 89-92 (July 27, 1965) 79 Stat. 283); 15 U.S.C. § 1333.) Under these circumstances, [the plaintiff] was put on inquiry notice many, many years ago and failed to diligently pursue his claim." (*Barker,* at p. 51.) As we have discussed with respect to the *Soliman* case, we find this dicta unpersuasive.

Furthermore, the question here is not whether the *public* adequately appreciated the health risks of smoking to excuse defendants' misrepresentations and false promises. Instead we will presume in support of the judgment that the jury found on substantial evidence that even if there were ample information in the public domain to convince reasonable observers of the hazards of smoking, defendants and their agents deliberately interfered with the *assimilation* of that information, particularly by smokers and prospective smokers. It was this class to which Whiteley belonged and to which defendants presumably owed a primary duty not to mislead. Nonsmokers were far less directly affected by the issue. Evidence was presented in this

---

[27] We note the court's refusal in *Myers, supra,* 28 Cal.4th 828, to discern the legislator's intent from the author's view of the bill: "Those comments were simply reasons given 'in support of repeal' of the statutory immunity for tobacco companies (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 67 (1997–1998 Reg. Sess.) Apr. 8, 1997, p. 2); they did not at all address retroactivity of the Repeal Statute. Moreover, we have repeatedly declined to discern legislative intent from comments by a bill's author because they reflect only the views of a single legislator instead of those of the Legislature as a whole. (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 [48 Cal.Rptr.2d 1, 906 P.2d 1057]; *Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 922 [16 Cal.Rptr.2d 226, 844 P.2d 545].)" (*Myers,* at p. 845.)

case that smokers were less attuned to warnings and more ready to believe defendants than were nonsmokers.

In this case, where we review fraud verdicts premised upon affirmative misrepresentations and false promises regarding the health risks of smoking and what actions defendants were taking and would take with respect to the "controversy," we believe that substantial evidence supports the jury's determination that Whiteley's reliance was reasonable in the circumstances.

## C. *No instructional error*

Defendants contend the court erred in refusing to instruct the jury in pertinent part that "[t]he plaintiff must have read or heard, directly or indirectly, the representation, and be able to identify the specific contents of the representation." Having concluded that Whiteley adequately identified the safety messages communicated by defendants and received and relied upon by her, the court did not err in refusing the proposed instruction.

## D. *No "fraud on the market" theory*

Defendants characterize Whiteley's fraud theory as "fraud on the market," a concept developed under federal securities law, which our Supreme Court in *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082 [23 Cal.Rptr.2d 101, 858 P.2d 568] (*Mirkin*) refused to import into California tort common law. "Fraud on the market" was never a theory considered by the jury and it has nothing to do with this case. "That doctrine makes it unnecessary for buyers or sellers of stock to prove they relied on a defendant's misrepresentations, on the theory that whether or not they relied the misrepresentation influenced the market price at which they later bought or sold. (See *Basic Inc. v. Levinson* [1988] 485 U.S. 224 [99 L.Ed.2d 194, 108 S.Ct. 978].)" (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 179 [132 Cal.Rptr.2d 490, 65 P.3d 1255].)

In *Mirkin, supra,* 5 Cal.4th 1082, shareholders brought a class action for common law deceit and negligent misrepresentation against the corporation and others whom they alleged intentionally misrepresented the corporation's financial condition in prospectuses and other public communications in order to inflate the price of its securities for more than their true value. The plaintiffs did not plead they had read or heard the representations, but argued that they had purchased the securities in reliance upon the integrity of the securities market and the superior knowledge of the defendants. They argued that their reliance was presumed under the "fraud on the market" doctrine available in federal securities actions pursued under rule 10b-5 of the Security and Exchange Commission. (*Mirkin*, at pp. 1088–1089.) "By rejecting the 'fraud on the market' doctrine, *Mirkin* held that a plaintiff suing for fraud or

negligent misrepresentation under California law must prove actual reliance. (*Mirkin, supra,* 5 Cal.4th at pp. 1090–1098.)" (*Small v. Fritz Companies, Inc., supra,* 30 Cal.4th at pp. 179–180.)

*Mirkin* recognized the continued vitality of the indirect communication cases and Restatement Second of Torts, section 533: "As the language of the Restatement indicates, a plaintiff who hears an alleged misrepresentation indirectly must still show 'justifiable reliance upon it . . . .' (Rest.2d Torts, § 533.)" (*Mirkin, supra,* 5 Cal.4th at p. 1096.) We believe Whiteley did just that. If the only reliance evidence alleged or presented by Whiteley was that she did not believe that defendants would be allowed to sell her something harmful, such evidence might be analogous to that supporting a fraud on the market theory—essentially that her reliance could be presumed from the fact the product was marketed and that she purchased it. Although Whiteley did testify that she did not believe defendants would sell her something they knew would cause cancer or death, as we have recounted above, such a statement was not the sole or even the principal evidence of her reliance. Nor did she contend that reliance upon the misrepresentations could be *presumed* from her purchase of cigarettes. She relied upon misrepresentations by defendants and their agents regarding the health consequences of smoking— the safety message that defendants intended to convey and that she received. Moreover, the jury was properly and repeatedly instructed with respect to the fraud-related causes and the negligent misrepresentation cause of action that they must find that Whitely *actually* and *justifiably relied* upon the truth of the misrepresentation.[28]

 Neither the "fraud on the market" doctrine, nor its context-specific rationale has any bearing on the fraud contended to have been practiced on Whiteley here. She was a member of the public targeted and intended by defendants to receive their misrepresentations. She did receive those health-related messages, through precisely the mechanisms of transmission intended by defendants and their agents. She adequately pleaded and proved her justifiable reliance upon the misstatements. Defendants have failed to show any defect in the jury's verdict on the fraud claims.

---

[28] The jury was instructed: "Leslie Whiteley must have acted in reliance upon the truth of the representation or the nonmisleading nature of the representation; [¶] Leslie Whiteley must have been justified in her reliance . . . ." (Fraud by intentional representation.) "Leslie Whiteley must have acted in reliance upon the [false] promise; [¶] Leslie Whiteley must have been justified in relying upon the promise made by the defendants . . . ." (Fraud by a false promise.) "Leslie Whiteley must have acted in reliance upon the truth of the representation; [¶] Leslie Whiteley must have been justified in relying upon the representation . . . ." (Fraud by negligent misrepresentation.)

## E. *Alleged inconsistent special verdicts on reliance and other claims*

Defendants raise additional claims with respect to the fraud verdict. Among other claims, they argue they are entitled to a new trial on the fraud claims because the jury verdicts rendered on the three affirmative fraud claims (finding that Whiteley had justifiably "acted in reliance" on the misrepresentations) were inconsistent with the verdict on the conspiracy to defraud claim (finding no reliance). The trial court rejected this argument upon defendants' new trial motion, finding the verdicts reconcilable. We need not address this issue as we have determined that a retrial is required in any event because of prejudicial error on the Immunity Statute issue.

Because the fraud verdicts were supported by substantial evidence and were not preempted by federal law, on remand defendants are not entitled to have judgment entered in their favor on these fraud causes of action, which must be retried.

## IV. Negligence Verdict and Legal Cause

The jury found that "the tobacco company defendants [were] negligent in the design of their products" and that "the negligence of the tobacco defendants [was] a cause of the injury and damage to Leslie Whiteley."[29] On appeal, defendants do not dispute that the record contains substantial evidence that smoking their products caused Whiteley's lung cancer. However, defendants contend that the verdict in favor of Whiteley on her negligence claim cannot stand because she failed to prove that any negligent design feature was *a cause* of her injury. Plaintiff's negligent design cause of action was premised not upon defendants' negligence in manufacturing and selling cigarettes per se, but upon allegations that defendants negligently designed the cigarettes, insofar as they could have been made safer. Plaintiff asserted that defendants negligently designed their cigarettes and that negligence was a substantial factor in bringing about Whiteley's injury.

"Legal causation is generally a question of fact to be determined by the jury . . . unless, as a matter of law, the facts admit of only one conclusion." (Flahavan et al., Cal. Practice Guide: Personal Injury (The Rutter Group

---

[29] Following the trial court's ruling that federal law preempted strict liability resting on a consumer expectations theory, Whiteley withdrew her remaining strict liability design defect claim (a risk-benefit theory) and proceeded on a theory of negligence in design. Product liability actions may be based upon allegations of negligence in the design of the product or upon a strict liability theory based upon an alleged defect in the design. In either case, "legal cause" is an element of the cause of action. (1 Madden & Owen on Product Liability (3d ed. May 2003) § 2:1, pp. 43–48, § 5:9, pp. 323–334; see 6 Witkin, Summary of Cal. Law (9th ed. 1988) § 1244, pp. 679–680.)

2003) ¶ 2:980, p. 2-315, citing *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205–1206 [114 Cal.Rptr.2d 470, 36 P.3d 11].) As we recognized in *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461 [38 Cal.Rptr.2d 739], "The substantial evidence standard of review also applies to the jury's findings on the issue of causation . . . ." (*Id.* at p. 476, citations omitted.)

Defendants argue that plaintiff failed to present substantial evidence of any safe alternative design or that defendants' alleged failure to produce a safe cigarette *caused* Whiteley's injury. They assert that Whiteley was "required to establish . . . a 'significant probability' that a *design* feature of the cigarettes [she] smoked caused her injury, that there was an alternative design that [d]efendants 'should have' implemented, *and* that such a design would have prevented her injuries." Defendants further contend that there was insufficient evidence that Whiteley would have smoked cigarettes incorporating the relevant design change, had they been available.

Plaintiff counters that the causation rule sought by defendants is inapplicable in latent-disease cases and that the appropriate standard can be found in the asbestos case *Rutherford, supra,* 16 Cal.4th 953, 977. We conclude even if *Rutherford* supplies the appropriate model for this "toxic tort" context, plaintiff failed to produce substantial evidence satisfying the causation formulation as set forth in that case.

Plaintiff argues that substantial evidence showed that defendants' negligence in failing to implement known technologies to reduce the carcinogen dose to which smokers were exposed was a substantial factor contributing to Whiteley's "aggregate dose" of carcinogens and thus to her risk of developing lung cancer. Plaintiff also argues defendants increased Whiteley's risk and subjected her to a "lifelong dose of carcinogens" by intentionally addicting her through manipulation of the nicotine in cigarettes.

Plaintiff cites testimony of expert witness Farone that it was feasible to reduce the cancer-causing potential of cigarettes by identifying and removing carcinogens from the smoke. "[I]f you remove the carcinogens from smoke, then you reduce the carcinogens that the smoker intakes, and you reduce the cancer-causing potential of the cigarette." Farone identified specific carcinogenic materials (nitrosamines and benzopyrenes, among others) that could be removed from cigarettes and also identified other steps (including the use of carbon filters and the clear identification of ventilation holes), which could have been taken to make cigarette smoking safer. He testified that the technology exists to reduce or remove all of the carcinogenic compounds from cigarettes. Different technologies existed to remove each class of compounds. Defense witness Dr. Donald Tashkin, testifying about the cancer-causing components of marijuana, admitted that benzopyrene is "felt to be involved in about 75 percent of human lung cancers."

Dr. Ronald Davis testified that cigarette smoking and lung cancer have a "dose-response relationship"—that is, "the more you smoke per day, the higher your risk of dying from lung cancer." "The higher the dose, the more dangerous it is, the greater the risk of getting the various diseases linked to smoking, in this case lung cancer."

Plaintiff argues that the jury could infer from this evidence that had defendants not maximized the nicotine impact, but instead removed or lessened nicotine or its impact, Whiteley would have stopped smoking. They also argue that had defendants removed or greatly reduced the carcinogens in all of their cigarettes, Whiteley necessarily would have smoked safer cigarettes.

" 'Causation' is an essential element of a tort action. Defendants are not liable unless their conduct . . . was a 'legal cause' of plaintiff's injury. [Citations.]" (Flahavan et al., Cal. Practice Guide: Personal Injury, *supra,* ¶ 2:979, pp. 2-314 to 2-315.) "Generally, the burden falls on the plaintiff to establish causation. [Citation.] . . . In the context of products liability actions, the plaintiff must prove that the defective products supplied by the defendant were a substantial factor in bringing about his or her injury. (*Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 127 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Endicott v. Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 926 [141 Cal.Rptr. 95]; see BAJI No. 3.76.) [¶] California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1044, fn. 2, 1052, fn. 7 [1 Cal.Rptr.2d 913, 819 P.2d 872].)" (*Rutherford, supra,* 16 Cal.4th at pp. 968–969.)

Defendants rely on cases arising in the ordinary products liability context where it is alleged a discrete event caused immediate injuries and the injuries were attributable to a design defect. In *Soule v. General Motors Corp., supra,* 8 Cal.4th 548, the plaintiff brought an action for strict products liability against the manufacturer of her automobile. She contended her enhanced injuries in an accident were caused by design defects in the automobile that allowed its wheel to break free and smash the floorboard into her feet. The Supreme Court held it was error to refuse the defendants' proposed instruction that any design defect was not a substantial or contributing cause of the plaintiff's enhanced injuries if those same injuries would have occurred even with a nondefective design. (*Id.* at pp. 572–573.) "A manufacturer is liable only when a defect in its product was a legal cause of injury. (*Cronin* [*v. J.B.E. Olson Corp.,*] *supra,* 8 Cal.3d at pp. 133–134.) A tort is a legal cause of injury only when it is a substantial factor in producing the injury. (*Mitchell v. Gonzales*[*, supra,*] 54 Cal.3d [at pp.] 1048–1054.) If the external force of a vehicle accident was so severe that it would have caused identical injuries

notwithstanding an abstract 'defect' in the vehicle's collision safety, the defect cannot be considered a substantial factor in bringing them about. (E.g., *Doupnik v. General Motors Corp.* (1990) 225 Cal.App.3d 849, 862–864 [275 Cal.Rptr. 715]; *Endicott v. Nissan Motor Corp.*[, *supra,*] 73 Cal.App.3d [at p.] 926; *Self* [*v. General Motors Corp.* (1974)] 42 Cal.App.3d [1,] 10 [116 Cal.Rptr. 575].)" (*Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 572–573, fn. omitted.)

*Endicott v. Nissan Motor Corp, supra,* 73 Cal.App.3d 917, upon which defendants also rely, was a products liability action arising out of the rupture of an allegedly defective lap seat belt in the plaintiff's automobile that broke when the plaintiff lost control of the car, struck an embankment and rolled over. The appellate court affirmed a judgment in favor of the manufacturer, rejecting the plaintiff's claim that the burden of proof of causation should have shifted to the manufacturer. The court concluded that, "although there is undoubtedly a statistical correlation between absence of seat belt (or rupture due to defect) and increased injuries in motor vehicle accidents, expert testimony will normally be necessary to establish proximate cause of injury on the individual facts. [Citation.] At bench, no substantial evidence supported a finding of proximate cause of injury sufficient to shift the burden of proof. Plaintiff's evidence merely presented a general probability of enhanced injury from nonuse of seat belts. . . . No witness, including plaintiff's medical experts, could say with any degree of certainty that plaintiff would not have sustained severe and disabling injuries if the belt had not ruptured, and plaintiff's medical expert even conceded the possibility that the very back injury that plaintiff suffered could have so occurred." (*Id.* at p. 927.) "[I]t would be pure speculation to assume that differently designed seat belts would have prevented plaintiff's injuries, for the testimony of possible prior damage to the seat belt, the conflict of opinion on the cause and timing of the rupture, and the difficulty in predicting what plaintiff's injuries would have been in so serious an accident if his seat belt had not ruptured, preclude any finding of significant probability of seat belt rupture as the proximate cause of enhanced injuries. In the absence of any such significant probability, it remained inapposite to change the burden of proof on a major aspect of plaintiff's cause of action—the proximate cause of his injuries." (*Id.* at p. 928.)

Based upon these and similar cases, defendants argue that Whiteley must show that a design feature of the cigarettes she smoked was a substantial factor in producing her injury *and* that an alternative design would have prevented her injuries.

Plaintiff argues that the rule is different for toxic tort latent-disease cases, urging that *Rutherford v. Owens-Illinois, Inc, supra,* 16 Cal.4th 953, provides

the appropriate rule. Plaintiff contends the rule for these cases is that "exposure to a defendant's toxins is a 'cause' of the disease if the defendant's misconduct was a substantial factor in *contributing* to the plaintiff's *risk* of disease by contributing to the *overall toxin dose*." Consequently, plaintiff urges that "substantial evidence showed that defendants' negligent design features were a substantial factor contributing to Whiteley's carcinogen dose and thus her risk of developing cancer."

In *Rutherford, supra,* 16 Cal.4th 953, the California Supreme Court adopted, in an asbestos-related lung cancer case, a standard of proof of causation which had been derived from medical malpractice cases and articulated in a negligence case involving asbestos exposure, *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409 [37 Cal.Rptr.2d 902], as follows: "*is there a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to plaintiff's injury.* [Citations.]" (*Id.* at p. 1416, fn. omitted, italics added; *Rutherford, supra,* at p. 976, fn. 11; cf. *Rutherford, supra,* at p. 977 [setting forth the standard of proof for asbestos-related cancer claims].)[30] *Rutherford* rejected as "unnecessary" a rule shifting to the defendants the burden of proof of causation in asbestos-related disease cases. The court held: "In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. In an asbestos-related cancer case, the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer. The jury should be so instructed." (*Id.* at pp. 982–983, fn. omitted.) The jury was so instructed in the instant case.

Thereafter, in *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71 [86 Cal.Rptr.2d 846, 980 P.2d 398], a toxic tort case involving alleged toxic chemicals in the workplace, the Supreme Court avoided expressly using the term "risk" in describing its *Rutherford* holding, stating: "In *Rutherford* [*,supra,* 16 Cal.4th 953], we addressed the question of *proof* of causation in 'the context of products liability actions.' (*Id.* at p. 968.) We explained: '[T]he plaintiff must prove that the defective products supplied by the

---

[30] Plaintiff's summary of the standard set forth in *Rutherford, supra,* 16 Cal.4th 953, omits the critical requirement of expert testimony establishing a "reasonable medical probability" that the exposures were a substantial factor bringing about the injury.

defendant were a substantial factor in bringing about his or her injury.' (*Ibid.*) In cases like the one before us, presenting complicated and possibly esoteric medical causation issues, the standard of proof ordinarily required is ' "a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to [the] plaintiff's injury." ' (*Id.* at p. 976, fn. 11; cf. *id.* at p. 977 [setting forth the standard of proof for asbestos-related cancer claims].) [¶] 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' (*Rutherford, supra,* 16 Cal.4th at p. 978.) Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' (*id.* at p. 969), but a very minor force that does cause harm is a substantial factor (*ibid.*). This rule honors the principle of comparative fault. (*Ibid.*)" (*Bockrath v. Aldrich Chemical Co., supra,* 21 Cal.4th 71, 79.)

"Reasonable medical probability" requires more than showing a mere *possibility* that defendant's conduct was a "substantial factor" in causing the injury. Cases predating *Rutherford* described the quantum of proof required for "reasonable probability" as *"more likely than not."* (Flahavan, et al., Cal. Practice Guide: Personal Injury, *supra,* [¶] 2:984, p. 2-316.1, citing, inter alia, *Ortega v. Kmart Corp., supra,* 26 Cal.4th 1200, 1205 [114 Cal.Rptr.2d 470, 36 P.3d 11]; *Sparks v. Owens-Illinois, Inc., supra,* 32 Cal.App.4th 461, 476 [38 Cal.Rptr.2d 739] [asbestos exposure injury];[31] *Cottle v. Superior Court* (*Oxnard Shores Co.*) (1992) 3 Cal.App.4th 1367, 1384 [5 Cal.Rptr.2d 882] ["toxic tort" case involving hazardous waste].)

Defendants contend the *Rutherford* variant on the standard test for causation is inapposite here as it addresses issues particularly relevant to asbestos cases and not raised in this two-manufacturer tobacco case. (We note that this case also went to the jury on a products liability theory against Metalclad Insulation, supplier of an asbestos product that was also asserted to be a "substantial factor" in Whiteley's lung cancer.)

*Rutherford, supra,* 16 Cal.4th 953, described the "medical problems and uncertainties accompanying factual proof of causation in an asbestos cancer case . . . ." (*Id.* at p. 974.) "At the most fundamental level, there is scientific uncertainty regarding the biological mechanisms by which inhalation of

---

[31] "In a personal injury action, causation must be proven within a reasonable medical probability based on expert testimony; a mere possibility is insufficient. [Citation.] A possible cause becomes 'probable' when, in the absence of other reasonable causal explanations, it is more likely than not that the injury resulted from its action. [Citation.]" (*Sparks v. Owens-Illinois, Inc., supra,* 32 Cal.App.4th at p. 476.) In *Sparks,* we recognized that the *Lineaweaver* formulation of the parties' burdens of proof was "slightly different." (*Sparks, supra,* at pp. 476–477, fn. 11.)

certain microscopic fibers of asbestos leads to lung cancer and mesothelioma." (*Id.* at p. 974.) Second, there exists the "irreducible uncertainty" of "*which* particular fiber or fibers actually caused the cancer to begin forming." (*Id.* at p. 975.) Uncertainty also exists as to whether the plaintiff was even exposed to the fibers from a product produced by a particular defendant. "The long latency periods of asbestos-related cancers mean that memories are often dim and records missing or incomplete regarding the use and distribution of specific products.. . . [¶] Finally, at a level of abstraction somewhere between the historical question of exposure and the unknown biology of carcinogenesis, the question arises whether the risk of cancer created by a plaintiff's exposure to a particular asbestos-containing product was significant enough to be considered a legal cause of the disease." (*Id.* at p. 975.) Asbestos is conceded to be a defective product. Plaintiffs bear the burden of proof to show exposure to defendant's product. (*Id.* at p. 975.) They need not prove the mechanism of carcinogenesis or connect the manufacturer and the specific fibers that caused the cancer. (*Id.* at p. 976.) *Rutherford* "bridg[ed] this gap in the humanly knowable by holding that plaintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth." (*Rutherford, supra,* 16 Cal.4th at pp. 976–977.)

This formulation would appear appropriate for toxic torts beyond asbestos. Indeed, *Bockrath v. Aldrich Chemical Co., supra,* 21 Cal.4th 71, which followed the *Rutherford* analysis in evaluating the sufficiency of complaint, was a toxic tort action based upon the plaintiff's contracting multiple myeloma, a form of cancer, following his alleged exposure to numerous different chemical substances over a 21-year period. (*Bockrath,* at p. 77 [86 Cal.Rptr.2d 846, 980 P.2d 398].) Injuries due to cigarette smoke easily fit the description of toxic torts which "involve claims for relief arising from chronic and latent illnesses or diseases allegedly caused by exposure to toxic substances. Toxic substances are 'substances whose manufacture, processing, distribution, use, or disposal presents or will present an unreasonable risk of injury to a person's health or to the environment.' " (1 Madden & Owen on Product Liability, *supra,* § 12:5, fn. omitted.) "Toxic tort cases involve personal injury . . . from exposure to a toxic substance, that may be chemical, mineralogical, biological, or radiological. In toxic torts, complex and even inscrutable questions of medical causation, often worsened by long periods of latency between initial exposure to the substance and medically discernable injury, are a significant obstacle to resolution of such claims." (*Ibid.,* fns. omitted; see *id.,*§ 12:5, p. 755, fn. 11 [cigarette

smoking is illustrative of the difficulties quantifying the contribution of a single factor as a cause of cancer].) "Generally, in toxic substance litigation, (1) the injury is neither traumatic nor an acute toxic response, but results from genetic or biochemical disruption; (2) the exposure is typically, though not necessarily, chronic and repeated; and (3) injury manifests itself after a latency period." (*Id.,* fn. 4, citing Note, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion and Statistical Evidence,* 96 Yale L.J. 376 (1986).) Products liability theories of recovery of strict liability, negligence and warranty are the primary bases of liability in toxic tort cases. (Madden & Owen, *supra,* § 12:5, p. 752, fn. 1.)

Nevertheless, we need not determine whether the *Rutherford* variant on proof of causation applies here, because it is clear that the evidence is insufficient to support the jury's finding even under that standard. (See *Kennedy v. Southern California Edison Co.* (9th Cir. 2001) 268 F.3d 763, 770.) Increased risk alone is not actionable. In toxic tort cases generally, "plaintiffs must establish, to a *reasonable medical probability, their illnesses* were caused by the toxic exposure. The fact the chemicals increased the possibility of sickness in the overall population does not suffice to provide a causal link with plaintiffs' illnesses." (Flahavan et al, Cal. Practice Guide: Personal Injury, *supra,* [¶] 2:985.1, p. 2-316.4.)

Here, plaintiff admits he "cannot meet the impossibly high standard of identifying the 'specific' carcinogen that caused [Whiteley's] cancer." Nor need he do so under the relaxed causation standard of *Rutherford.* Defendants do not dispute that plaintiff has adequately shown that Whiteley's exposure to each defendant's cigarette products "in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of [carcinogens she] inhaled or ingested, and hence to the *risk* of developing [lung] cancer" (*Rutherford, supra,* 16 Cal.4th at pp. 976–977, fn. omitted). As identified by plaintiff's expert witnesses, the negligent design of defendants' cigarettes resulted in cigarettes less "safe" than they could have been if cigarette smoke's cancer causing substances had been reduced or removed—or less addictive had defendants not manipulated nicotine levels. The question here is whether plaintiff has shown "in reasonable medical probability" that the alleged *negligent design* of those cigarette products was a substantial factor contributing to the dose of carcinogens Whiteley inhaled or ingested, and hence to her risk of developing lung cancer.

We must conclude that plaintiff's evidence on this point was insufficient to support the finding that such negligence was a "cause" of Whiteley's injuries. Plaintiff's expert witnesses did not attempt to quantify the likelihood that the asserted design defects of cigarettes, as distinguished from smoking cigarettes in general, contributed to Whiteley's developing lung cancer. Nor did they opine that the negligent design of cigarettes was "in reasonable medical

probability" a substantial factor contributing to her lung cancer (or even to her *risk* of developing lung cancer.) Farone testified specifically about carcinogens that could be removed from cigarettes, making them "safer." Testimony concerning nicotine "manipulation" was admitted—specifically, that defendants developed methods to remove tar without lowering the nicotine levels of cigarettes, thus keeping the addictive properties of cigarettes high. However, such testimony does not rise to the level of a "reasonable medical probability" that such negligent design was a substantial factor in Whiteley's lung cancer.

Nor was the gap bridged by the testimony of expert witness Davis that cigarette smoking and lung cancer have a "dose-response relationship"—that is, "the more you smoke per day, the higher your risk of dying from lung cancer." That cigarette smoking generally has a "dose-response relationship" with lung cancer risk, does not answer the question whether the design defects identified in this case were more likely than not a "substantial factor" contributing to Whiteley's developing the disease. That gap must be filled by expert testimony, not jury speculation. This case was not tried on a "consumer expectation" theory (allowing the jury to bring their own common experience and expectations to measure), but upon a negligent design theory, requiring competent expert testimony on the issue. (See *Rutherford, supra,* 16 Cal.4th at pp. 976–977, fn. 11; *Soule, supra* 8 Cal.4th at p. 569.)

Nor does plaintiff cite any evidence from this record from which the jury could assume that, were the suggested design changes made, Whiteley would have smoked the safer cigarettes, smoked less, or quit smoking altogether. The jury could only speculate that the design, manufacture and marketing of "safer" cigarettes would have resulted in Whiteley ingesting fewer carcinogens or quitting smoking altogether. Indeed, such speculation would run counter to the evidence, which showed that when Whiteley moved from unfiltered to filtered cigarettes, the number of cigarettes she smoked actually *increased.*

In *Cipollone v. Liggett Group, Inc.* (D.N.J. 1988) 683 F.Supp. 1487, despite overwhelming evidence from which jury could conclude that smoking caused the plaintiff's lung cancer and expert testimony that the plaintiff's risk of developing lung cancer would have been reduced by between 8 percent to 17 percent if she switched to the safer palladium cigarette in 1971, the court held that the design defect claim could not stand. The plaintiff failed to present evidence that she would have continued to smoke the palladium cigarette if design changes had been made. (*Id.* at p. 1493; see also *Boerner v. Brown & Williamson Tobacco Co.* (E.D.Ark. 2000) 121 F.Supp.2d 1252 [no evidence from which jury could infer plaintiff would have used any of the safer cigarette designs].)

On this record, there is simply no substantial evidence from which the jury could conclude that the negligent design of cigarettes was "in reasonable medical probability" a "substantial factor" contributing to Whiteley's risk of developing lung cancer.

Consequently, on remand defendants are entitled to a judgment in their favor on the negligent design cause of action.

We need not address the related claim raised by defendants that the trial court erred in refusing to give BAJI No. 9.00.6[32] in connection with the negligent design claim.

Neither need we address defendants' argument that Whiteley's failure to heed the Surgeon General's warnings on cigarette packages was an independent intervening cause of her injury—a claim defendants waived in any event by failing to raise it below and in light of their successful in limine motion to preclude argument or reference to Whiteley's "acceptance of responsibility" for injuries resulting from her decision to smoke.[33]

Nor do we address defendants' challenge to the punitive damages award. Upon remand and retrial of the remaining claims, the trial court will doubtless be guided by *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513] and other recent authority in that evolving area of the law.

---

[32] BAJI No. 9.00.6 provides: "The (manufacturer or seller) of a product is not liable for [injuries] [death] caused by a defect in its design, which existed when the product left the possession of the (manufacturer or seller), if:

"1. The product is inherently unsafe and the product is known to be unsafe by the ordinary consumer, who has the ordinary knowledge common to the community, and who consumes the product; and

"2. The product is a common consumer product intended for personal consumption." (BAJI No. 9.00.6.)

That instruction, which is used in strict liability claims, instructs the jury in conformity with Restatement Second of Torts (1965) section 402A, comment i, page 352, that in order to hold a manufacturer for design defect, "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. . . . Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; . . ." (Rest.2d Torts, § 402A, com. i, p. 352.)

[33] Defendants sought to bar such testimony and argument on grounds it was irrelevant to the issue of legal responsibility in the case, that it would confuse and mislead the jury, and that it would unduly prejudice defendants. Defendants pointed out that in a previous similar case plaintiff's counsel had used the "acceptance of responsibility" theme to evoke sympathy for a plaintiff who accepted her responsibility by enduring a premature death and arguing that defendants must accept their share of the joint responsibility for the plaintiff's injury.

## Disposition

The judgment is reversed and the matter remanded to the trial court for further proceedings in accordance with the views set forth herein. Each party is to bear its own costs on appeal.

Haerle, J., and Lambden, J., concurred.

A petition for a rehearing was denied April 29, 2004.